**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| LESLIE PURYEAR, *on behalf of himself and all those similarly situated*, | |
| Plaintiff, | |
| v. | Civil Action No. 3:24-cv-00479-REP |
| CHADWICK DOTSON, *in his individual capacity*, | |
| HAROLD CLARKE, *in his individual capacity*, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION
FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT,
PROVISIONAL CERTIFICATION OF SETTLEMENT CLASS,
AND APPROVAL OF NOTICE**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ iii

PRELMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 1

I.   THE LITIGATION BETWEEN PLAINTIFF AND VDOC ...................................... 1

II.   THE MEDIATION AND RESULTING SETTLEMENT AGREEMENT ...................... 3

    A.   Monetary Terms of Settlement ........................................................................ 4

    B.   Administration of Settlement ........................................................................... 5

    C.   Attorneys' Fees ................................................................................................ 6

ARGUMENT ....................................................................................................................... 6

I.   PRELIMINARY APPROVAL SHOULD BE GRANTED BECAUSE THE
SETTLEMENT AGREEMENT IS IN THE RANGE OF POSSIBLE APPROVAL. ............... 6

    A.   The Fairness Factors ....................................................................................... 7

        1.   Posture of the Case ............................................................................ 7

        2.   Extent of Discovery .......................................................................... 8

        3.   Circumstances Surrounding Negotiations ........................................ 9

        4.   Experience of Counsel .................................................................... 10

    B.   The Adequacy Factors .................................................................................. 10

        1.   Relative Strength of Plaintiff's Case on the Merits and Difficulties of Proof or Strong Defenses Likely at Trial ................................................................ 10

        2.   Duration and Expense of Additional Litigation ............................. 11

        3.   Solvency of Defendant and Likelihood of Recovery on a Litigated Judgment 12

        4.   Degree of Opposition ...................................................................... 12

    C.   Reasonableness ............................................................................................. 12

        1.   The Size of the Recovery is Reasonable ........................................ 13

        2.   The Service Payment to Mr. Puryear Is Reasonable ...................... 14

        3.   The Attorneys' Fees and Costs are Reasonable .............................. 18

II.   A SETTLEMENT CLASS SHOULD BE PROVISIONALLY CERTIFIED UNDER
RULES 23(a), 23(b)(2), and 23(b)(3). ........................................................................ 22

    A.   Rule 23(a) is Satisfied .................................................................................. 22

        1.   Rule 23(a)(1) – Numerosity ........................................................... 22

        2.   Rule 23(a)(2) – Commonality ........................................................ 23

        3.   Rule 23(a)(3) – Typicality .............................................................. 24

4.    Rule 23(a)(4) – Adequacy of Representation ................................................. 25

B.    Rule 23(b)(3) is Satisfied ........................................................................ 25

C.    Plaintiff's Counsel Satisfy Rule 23(g) Requirements ................................ 28

III.  THE PROPOSED CLASS NOTICE SHOULD BE DISSEMINATED TO

THE CLASS ................................................................................................ 28

IV.  PROPOSED SCHEDULE RELATED TO FINAL APPROVAL ..................................... 30

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*In re A.H. Robins Co., Inc.*,
    88 B.R. 755 (E.D. Va. 1988) ................................................................................................ 8

*Archbold v. Wells Fargo Bank, N.A.*,
    No. 3:13-CV-24599, 2015 WL 4276295 (S.D. W. Va. July 14, 2015) .................................... 9

*Barnes v. District of Columbia*,
    No. 1:06-cv-00315 (D.D.C. Nov. 4, 2013) ............................................................................ 14

*Bicking v. Mitchell Rubenstein & Assocs., P.C.*,
    No. 3:11CV78, 2011 WL 5325674 (E.D. Va. Nov. 3, 2011) ................................................. 27

*Binotti v. Duke Univ.*,
    No. 1:20-CV-470, 2021 WL 5366877 (M.D.N.C. Aug. 30, 2021) ........................... 16, 17, 18

*Brown v. Transurban USA, Inc.*,
    318 F.R.D. 560 (E.D. Va. 2016) ..................................................................................... 24, 26

*Burke v. Shapiro, Brown & Alt, LLP*,
    No. 3:14CV201, 2016 WL 2894914 (E.D. Va. May 17, 2016) ............................................. 15

*Carroll v. Northampton Rests., Inc.*,
    No. 2:21-CV-115, 2024 WL 1223442 (E.D. Va. Mar. 21, 2024) ............................................ 8

*Comm'rs of Pub. Works of City of Charleston v. Costco Wholesale Corp.*,
    340 F.R.D. 242 (D.S.C. 2021) ................................................................................... 6, 7, 10

*Comm'rs of Pub. Works of City of Charleston v. Costco Wholesale Corp.*,
    No. 2:21-CV-42, 2022 WL 214531 (D.S.C. Jan. 24, 2022) ................................................... 7

*In re Cook Med., Inc., Pelvic Repair Sys. Prods. Liab. Litig.*,
    365 F. Supp. 3d 685 (S.D. W. Va. 2019) ............................................................................. 21

*Deem v. Ames True Temper, Inc.*,
    No. 6:10-CV-01339, 2013 WL 2285972 (S.D. W. Va. May 23, 2013) ................................. 21

*DeWitt v. Darlington Cnty.*,
    No. 4:11-CV-00740, 2013 WL 6408371 (D.S.C. Dec. 6, 2013) ........................................... 21

*Doe v. Chao*,
    435 F.3d 492 (4th Cir. 2006) ................................................................................................ 19

*EQT Prod. Co. v. Adair*,
  764 F.3d 347 (4th Cir. 2014) ...................................................................22

*Galloway v. Williams*,
  No. 3:19-CV-470, 2020 WL 7482191 (E.D. Va. Dec. 18, 2020) ...........................................21

*Good v. Am. Water Works Co., Inc.*,
  No. CV 2:14-01374, 2016 WL 5746347 (S.D. W. Va. Sept. 30, 2016) ................................28

*Gunter v. Ridgewood Energy Corp.*,
  223 F.3d 190 (3d Cir. 2000)...........................................................................18, 19

*Haney v. Genworth Life Ins. Co.*,
  No. 3:22CV55, 2023 WL 174956 (E.D. Va. Jan. 11, 2023)...................................................10

*Helmick v. Columbia Gas Transmission*,
  No. 2:07-cv-00743, 2010 WL 2671506 (S.D. W. Va. July 1, 2010).....................................17

*Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  855 F. Supp. 825 (E.D.N.C. 1994)..............................................................................8

*In re Jiffy Lube Secs. Litig.*,
  927 F.2d 155 (4th Cir. 1991) ......................................................................6, 7, 8, 9

*Jonathan R. v. Just.*,
  344 F.R.D. 294 (S.D. W. Va. 2023)............................................................................22

*Kelly v. Johns Hopkins Univ.*,
  No. 1:16-CV-2835, 2020 WL 434473 (D. Md. Jan. 28, 2020).........................................16, 17

*Kernats v. O'Sullivan*,
  35 F.3d 1171 (7th Cir. 1994) ...................................................................................11

*Kirven v. Cent. States Health & Life Co. of Omaha*,
  No. CA 3:11-2149, 2015 WL 1314086 (D.S.C. Mar. 23, 2015) ...............................................9

*Langley v. Coughlin*,
  715 F. Supp. 522 (S.D.N.Y. 1989) ..........................................................................26

*Lomascolo v. Parsons Brinckerhoff, Inc.*,
  No. 1:08CV1310, 2009 WL 3094955 (E.D. Va. Sept. 28, 2009) ...........................................8

*Matheson v. T-Bone Rest., LLC*,
  No. 09 CIV. 4214 DAB, 2011 WL 6268216 (S.D.N.Y. Dec. 13, 2011) ................................16

*McAdams v. Robinson*,
  26 F.4th 149 (4th Cir. 2022) .................................................................................28

*In re MicroStrategy, Inc. Sec. Litig.*,
    148 F. Supp. 2d 654 (E.D. Va. 2001) ..................................................................12

*Minter v. Wells Fargo Bank, N.A.*,
    283 F.R.D. 268 (D. Md. 2012)...........................................................................29

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985)....................................................................................11, 12

*Moore v. Napolitano*,
    926 F. Supp. 2d. 8 (D.D.C. 2013) ......................................................................10

*Nelson v. Warner*,
    336 F.R.D. 118 (S.D. W. Va. 2020).....................................................................25

*In re Outer Banks Power Outage Litig.*,
    No. 4:17-CV-141, 2018 WL 2050141 (E.D.N.C. May 2, 2018) ......................6, 7, 9

*In re Peanut Farmers Antitrust Litig.*,
    No. 2:19-CV-00463, 2021 WL 9494033 (E.D. Va. Aug. 10, 2021) ......................16

*Pitt v. City of Portsmouth*,
    221 F.R.D. 438 (E.D. Va. 2004) ........................................................................27

*Reed v. Alecto Healthcare Servs., LLC*,
    2022 WL 4115858 (N.D. W. Va. July 27, 2022)...................................................26

*Roy v. Los Angeles*,
    No. 2:12-cv-09012 (C.D. Cal. Nov. 25, 2020) .....................................................14

*Scott v. Clarke*,
    61 F. Supp. 3d 569 (W.D. Va. 2014) ..................................................................22

*Sharp Farms v. Speaks*,
    917 F.3d 276 (4th Cir. 2019) .............................................................................25

*Sims v. BB&T Corp.*,
    No. 1:15-CV-732, 2019 WL 1993519 (M.D.N.C. May 6, 2019) ...........................21

*Skochin v. Genworth Fin., Inc.*,
    No. 3:19-CV-49, 2020 WL 6536140 (E.D. Va. Nov. 5, 2020) ........................18, 19

*Soutter v. Equifax Info. Servs., LLC*,
    307 F.R.D. 183 (E.D. Va. 2015).........................................................................23

*Swart v. Miyares*,
    No. 3:23CV753, 2024 WL 466797 (E.D. Va. Jan. 31, 2024)..................................19

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
    325 F.R.D 162 (D.S.C. 2018) .................................................................27

*In re The Mills Corp. Secs. Litig.*,
    265 F.R.D. 246 (E.D. Va. 2009) ..........................................................7, 8, 9

*Thomas v. FTS USA, LLC*,
    312 F.R.D. 407 (E.D. Va. 2016) ............................................................25

*Thorpe v. Va. Dep't of Corr.*,
    No. 2:20CV00007, 2023 WL 5038692 (W.D. Va. Aug. 8, 2023)...........29

*In re Titanium Dioxide Antitrust Litig.*,
    No. 10-CV-00318, 2013 WL 6577029 (D. Md. Dec. 13, 2013).............17

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).....................................................................23, 24, 25

*West v. Prince George's Cnty.*,
    No. 21-0863, 2022 WL 125936 (D. Md. Jan. 13, 2022).......................11

*Williams v. Big Picture Loans, LLC*,
    339 F.R.D. 46 (E.D. Va. 2021)...........................................................23, 24

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    7 F.4th 227 (4th Cir. 2021).....................................................................23

**Statutes**

42 U.S.C. § 1983...................................................................................2, 20

42 U.S.C. § 1988........................................................................................20

Va. Code Ann. § 8.01-195.11 ...............................................................13, 20

Va. Code Ann. § 53.1-202.3(A)...................................................................23

Va. Code § 53.1-202.3(A)(1)–(17) ..........................................................1, 2

**Rules**

Fed. R. Civ. P. 23 ...............................................................................*passim*

Fed. R. Civ. P. 54(d)(2)...............................................................................22

**Other Authorities**

Bernadette Rabuy & Daniel Kopf, *Prisons of Poverty: Uncovering the pre-incarceration incomes of the imprisoned*, PRISON POLICY INITIATIVE (July 9, 2015), https://www.prisonpolicy.org/reports/income.html........................................27

*Manual for Complex Litigation* (Fourth) § 21.632 (Fed. Judicial Center 2024) .........................6, 7

S. Rep. No. 94–1011 ........................................................................................................20

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 272 tbl.14 (2010)........................................................................................................................21

Tom Jackman & Laura Vozzella, *Lawsuit: Va. prison leaders kept inmates from early release*, WASH. POST (July 5, 2024) ...........................................................16

## PRELMINARY STATEMENT

Plaintiff Leslie Puryear respectfully submits this memorandum in support of his unopposed motion for an order, pursuant to Federal Rule of Civil Procedure 23, (1) preliminarily approving the proposed Settlement Agreement, a copy of which is attached hereto as Exhibit 1; (2) conditionally certifying a settlement class; and (3) approving the form and manner of giving notice of the settlement to members of the proposed settlement class.

After vigorous advocacy and negotiation, Plaintiff and Defendants Chadwick Dotson and Harold Clarke agreed to settle the claims in this case. The proposed Settlement Agreement provides significant monetary relief to a proposed class of 53 people whom Plaintiff alleges were over-detained pursuant to Virginia Department of Corrections ("VDOC") policy. The Parties negotiated the Settlement Agreement with Magistrate Judge Summer L. Speight, which they believe achieves a fair and adequate resolution and agree that it merits preliminary approval.

## BACKGROUND

### I.    THE LITIGATION BETWEEN PLAINTIFF AND VDOC

In 2020, the Virginia General Assembly amended the state's earned sentence credit ("ESC") program to increase the number of credits that people in VDOC custody could earn for good behavior and program participation. Previously, a person in custody could earn up to 4.5 ESCs for every 30 days in prison; one ESC amounted to one day deducted from the person's sentence. The 2020 law allowed everyone in VDOC custody to earn up to 15 ESCs for every 30 days in prison unless they were serving sentences for a list of offenses enumerated in the statute, in which case they could earn a maximum of 4.5 ESCs for every 30 days served. *See* Va. Code § 53.1-202.3(A)(1)–(17). The new law went into effect on July 1, 2022, and applied retroactively.

One of the enumerated, excluded offenses is "Robbery under § 18.2-58 or carjacking under § 18.2-58.1." Va. Code § 53.1-202.3(A)(9). Plaintiff Leslie Puryear, who was serving a

1

sentence for *attempted* robbery, was initially told that he would receive expanded ESCs and be released soon after July 1, 2022. But before the law went into effect, VDOC reversed its policy, apparently by interpreting § 53.1-202.3(A)(9) to exclude people serving sentences for inchoate offenses associated with robbery and carjacking, such as Mr. Puryear.

Mr. Puryear, who maintained his entitlement to expanded ESCs, filed a petition for a writ of habeas corpus in September 2023. Before the Virginia Supreme Court could rule on his petition, in November 2023, VDOC again reversed its policy, retroactively granting Mr. Puryear and others serving sentences for inchoate offenses related to robbery and carjacking expanded ESCs. It released those who, like Mr. Puryear, were immediately eligible for release with expanded ESCs. This group included 30 people, whom VDOC referred to in internal documents as the "Puryear Releases."

Between September 1, 2022, when the VDOC's obligation to grant expanded ESCs began, and November 2023, when the "Puryear Releases" occurred, 23 additional people serving sentences for inchoate offenses related to robbery and carjacking were denied expanded ESCs and were released when their release dates came up as calculated without enhanced credits, sometime after September 1, 2022, but prior to November 2023. Had VDOC not excluded these individuals from expanded ESCs, they would have been released sooner.

On June 29, 2024, Mr. Puryear filed a putative class action lawsuit on behalf of himself and all others who had been serving sentences in VDOC custody for inchoate offenses related to robbery or carjacking and who were incarcerated for longer than they would have been had VDOC not excluded them from expanded ESCs prior to November 2023. *See* Dkt. 1. Mr. Puryear asserted claims under 42 U.S.C. § 1983 for violations of substantive and procedural due process under the Fourteenth Amendment and for cruel and unusual punishment under the

2

Eighth Amendment, as well as for false imprisonment under Virginia law, against the current and former Directors of VDOC—Dotson and Clarke, respectively.

Defendants moved to dismiss, Dkt. 17, Plaintiff responded, Dkt. 20, and Defendants replied, Dkt. 21. Before the Court ruled on the motion, it ordered the Parties to begin exchanging discovery requests and responses. *See* Dkt. 23. The Court also held a status conference on September 18, 2024, where the Parties agreed that mediation might be productive, and the Court ordered mediation with Magistrate Judge Summer L. Speight. *See* Dkt. 30.

## II.    THE MEDIATION AND RESULTING SETTLEMENT AGREEMENT

In preparation for mediation, the Parties exchanged discovery requests and responses, prepared mediation statements, and exchanged written settlement offers. *See* Decl. of R. Livengood (Ex. 2) ¶ 12. Defendants provided Plaintiff with a list of potential class members, VDOC policy documents regarding the ESC program, and internal emails regarding the Puryear Releases. *Id.* ¶¶ 8–10. The Parties participated in a full-day mediation session with Judge Speight on October 28, 2024, and another half-day mediation session on November 1, 2024. *Id.* ¶ 12. The Settlement Agreement is the result of these negotiations.

The Parties have agreed, through the Settlement Agreement, to seek certification of a Settlement Class consisting of any individual in the custody of VDOC as of July 1, 2022 serving a sentence for an inchoate crime associated with robbery or carjacking; who was not awarded expanded ESCs on those inchoate offenses under Virginia Code § 53.1-202.3(B), as amended; who was released from VDOC custody on or before November 30, 2023; and who would have been released earlier than they were had they been awarded expanded ESCs as of July 1, 2022. "Class Member" is limited to those individuals who were excluded from earning expanded ESCs solely because of an inchoate robbery and/or carjacking offense. *See* Settlement Agmt. ¶ 1(c). The Parties understand that there are 53 class members. Their identities and the number of days

they served past their release dates as calculated with expanded ESCs (*i.e.*, number of days of over-detention) as currently known to the Parties are contained in Exhibit A to the Settlement Agreement. Based on the information exchanged during discovery, the Parties believe that Exhibit A is a comprehensive list of potential class members.

### A.  Monetary Terms of Settlement

The Settlement Agreement establishes a Settlement Fund of up to $1,599,694, to be allocated as follows:

- Up to $1,139,694 in cash payments to settlement class members, who will be compensated according to how many days they were over-detained in VDOC custody at a rate of approximately $118 per day, or $43,070 per year, of over-detention;

- Up to $40,000 as a service payment to Mr. Puryear, for his service as the Named Plaintiff, subject to Court approval;

- Up to $20,000 or actual costs to the Settlement Administrator for the costs of executing the Agreement; and

- Up to $400,000 in attorneys' fees to Plaintiff's Counsel, which represents approximately 25% of the Settlement Fund, subject to Court approval.

*See* Settlement Agmt. ¶ 4.

This is not a claims-made settlement; any class member who does not opt-out during the notice period will receive a payment and will be bound by the terms of the Agreement. The preliminary value of the cash payments to class members ($1,139,694) has been determined based on the total number of days of over-detention as aggregated across the class (9,646), times a payment of $118 per day of over-detention, plus compensation of $1,000 for the three class

4

members whose award would otherwise be less than $1,000. The projected payment to each class member is listed in Exhibit A to the Settlement Agreement.

Should any potential class member settle their claims separately or opt out prior to final approval of the settlement, Defendants will not be required to fund that member's pro rata share of the settlement fund. Furthermore, the Parties understand that one class member, Jorge Jovel, was deported shortly after he was released from VDOC custody; the Parties will make best efforts to contact Mr. Jovel during the notice period, but if they are unable to do so, Defendants will not be responsible for funding Mr. Jovel's pro rata share of the fund. After final approval, Defendants will deposit the final value of the cash payments—$1,139,694 minus any separate settlements, opt-outs, and Mr. Jovel's share if he is unreachable—into an escrow account. *See* Settlement Agmt. ¶ 4.a.i.

Defendants will also deposit $40,000, intended as a service payment to Mr. Puryear, into the account. *Id.* ¶ 4.b. If the Court approves a service payment of less than $40,000, the difference between the amount approved and $40,000 will be distributed among the class members in proportion to how many days each class member was over-detained. *Id.*

**B. Administration of Settlement**

The Settlement Agreement provides that Defendants will pay up to $20,000 in administration costs, and Settlement Services, Inc. ("SSI") will be retained as Settlement Administrator to distribute the notice, answer questions from class members, issue payments, prepare tax documents, and otherwise administer the settlement. SSI is an experienced class action claims administrator. *See* Decl. of R. Hyde (Ex. 3) ¶¶ 2–3. SSI has reviewed the preliminary agreement and has agreed to administer it for no more than $20,000. *Id.* ¶ 6.

Plaintiff's counsel have agreed to take on some of the work of settlement administration to ensure that costs do not go over this number. *See* Livengood Decl. ¶ 13.

### C.  Attorneys' Fees

Under the terms of the Settlement Agreement, Defendants will not oppose Plaintiff's Counsel's request to the Court for up to $400,000 in attorneys' fees at the time that the Parties seek final approval of the settlement. *See* Settlement Agmt. ¶ 4(c). This figure represents approximately 25% of the total Settlement Fund. Defendants will only be responsible for funding whatever amount the Court approves in attorneys' fees; if the Court approves less than $400,000, the difference between $400,000 and the approved amount will not become part of the pro rata fund for class members. *Id.*

**ARGUMENT**

The Settlement Agreement is a fair, reasonable, and adequate resolution of the matter that provides substantial and meaningful relief to members of the Class, results from extensive litigation and arm's-length negotiations by experienced counsel, and takes account of the complexity and risks at issue in this litigation.

### I.    PRELIMINARY APPROVAL SHOULD BE GRANTED BECAUSE THE SETTLEMENT AGREEMENT IS IN THE RANGE OF POSSIBLE APPROVAL.

Approval of a proposed class action settlement typically proceeds in two steps. *See In re Jiffy Lube Secs. Litig.*, 927 F.2d 155, 158–59 (4th Cir. 1991). First, the Court grants preliminary approval if it determines that the settlement "is within the range of possible approval." *Comm'rs of Pub. Works of City of Charleston v. Costco Wholesale Corp.*, 340 F.R.D. 242, 249 (D.S.C. 2021) ("*Comm'rs of Pub. Works*") (cleaned up); *see also, e.g.*, *In re Outer Banks Power Outage Litig.*, No. 4:17-CV-141, 2018 WL 2050141, at *3 (E.D.N.C. May 2, 2018); *Manual for Complex Litigation* (Fourth) § 21.632 (Fed. Judicial Center 2024) ("*Manual*").

Second, after notice of the settlement is provided to the Class and the Court conducts a fairness hearing, the Court determines whether the settlement is "fair, reasonable and adequate," as required under Fed. R. Civ. P. 23(e)(2), such that final approval should be granted. *See Comm'rs of Pub. Works of City of Charleston v. Costco Wholesale Corp.*, No. 2:21-CV-42, 2022 WL 214531, at *2-4 (D.S.C. Jan. 24, 2022); *In re Outer Banks Power Outage Litig.*, 2018 WL 2050141, at *2; *Manual* §§ 21.634-35. Fairness and adequacy are both assessed using multi-factor tests, *see, e.g.*, *Jiffy Lube*, 927 F.2d at 158-59; *Comm'rs of Pub. Works*, 340 F.R.D. at 249-50; *In re The Mills Corp. Secs. Litig.*, 265 F.R.D. 246, 254 (E.D. Va. 2009) ("*Mills*"), and there is no specific test used to assess reasonableness, *see, e.g.*, *Comm'rs of Pub. Works*, 340 F.R.D. at 249-50; *Mills*, 265 F.R.D. at 258. The fairness factors are:

> (1) the posture of the case at the time the proposed settlement was reached, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the settlement negotiations, and (4) counsel's experience in the type of case at issue.

*Comm'rs of Pub. Works*, 340 F.R.D. at 249 (citing *Jiffy Lube*, 927 F.2d at 158-59).

The adequacy factors are:

> (1) the relative strength of the case on the merits, (2) any difficulties of proof or strong defenses the plaintiff and class would likely encounter if the case were to go to trial, (3) the expected duration and expense of additional litigation, (4) the solvency of the defendants and the probability of recovery on a litigated judgment, [and] (5) the degree of opposition to the proposed settlement[.]

*Id.* at 250 (citing *Jiffy Lube*, 927 F.2d at 159). Consideration of these factors demonstrates that the proposed settlement is fair, reasonable, adequate, and well within the range of possible approval.

## A.  The Fairness Factors

### 1.  Posture of the Case

This factor addresses principally "how far the case has come from its inception." *Mills*, 265 F.R.D. at 254. Settlement at a very early stage may suggest "collusion among the settling

parties" and that the proposed settlement is not legitimate. *Jiffy Lube*, 927 F.2d at 159; *see also Mills*, 265 F.R.D. at 254. Here, Defendants filed a motion to dismiss, Dkt. 17, which Plaintiff strongly opposed, Dkt. 20, and the Parties engaged in written discovery, exchanging dozens of interrogatories, document requests, and responses, *see* Livengood Decl. ¶ 8. The vigorous litigation of the motion to dismiss demonstrates a clear lack of collusion, and the exchange of written discovery evinces the Parties' intent to litigate this case fully and aggressively absent a reasonable settlement. At the same time, this settlement is coming early enough that class members may "choose to be included or excluded based on the terms of the proposed settlement." *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 855 F. Supp. 825, 829 (E.D.N.C. 1994). *See also id.* ("If such agreement had been reached after notification, potential class members would have had to decide whether to opt-in or opt-out of the class without knowledge of the proposed settlement."). As such, the posture of this case favors approval of the settlement.

### 2. <u>Extent of Discovery</u>

This factor weighs in favor of approval where the parties have conducted "[s]ufficient discovery to permit counsel and the parties to fairly evaluate the liability and financial aspects of a case." *In re A.H. Robins Co., Inc.*, 88 B.R. 755, 760 (E.D. Va. 1988). *See also Lomascolo v. Parsons Brinckerhoff, Inc.*, No. 1:08CV1310, 2009 WL 3094955, at *11 (E.D. Va. Sept. 28, 2009). Such is the case here. Both Parties produced initial disclosures and issued and responded to interrogatories and requests for production of documents, Livengood Decl. ¶ 8, allowing them to enter mediation with a shared sense of the number of potential class members and scope of over-detention, *id.* ¶¶ 10–11, and thereby to assess and negotiate a damages amount. *See Carroll v. Northampton Rests., Inc.*, No. 2:21-CV-115, 2024 WL 1223442, at *4 (E.D. Va. Mar. 21,

2024) (extent of discovery factor weighed in favor of approval where information exchanged in discovery "proved useful because it provided a basis for calculating damages and reaching a reasonable settlement"). Furthermore, during mediation, the Parties informally exchanged information—for example, Plaintiff's Counsel gave Defendants information regarding their fees accrued this far, and the Parties jointly reviewed records to come to a final understanding of the number of class members and length of over-detention, reflected in Exhibit A to the Settlement Agreement. *See Jiffy Lube*, 927 F.2d at 159 (exchange of informal discovery counsels in favor of settlement approval). Between formal and informal discovery and the motion to dismiss briefing—which allowed the Parties to assess the arguments regarding qualified immunity, the primary legal issue in this case—the Parties' communications narrowed points of disagreement and allowed for more informed settlement negotiations. This factor favors approval.

### 3.  Circumstances Surrounding Negotiations

This factor serves to assure that the settlement is the result of arm's-length negotiations based on counsel's informed understanding of the case. *See Mills*, 265 F.R.D. at 255. "Absent evidence to the contrary, the Court should presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion." *Archbold v. Wells Fargo Bank, N.A.*, No. 3:13-CV-24599, 2015 WL 4276295, at *2 (S.D. W. Va. July 14, 2015); *Kirven v. Cent. States Health & Life Co. of Omaha*, No. CA 3:11-2149, 2015 WL 1314086, at *5 (D.S.C. Mar. 23, 2015) (same). The circumstances here include a vigorously contested motion to dismiss; the exchange of formal discovery; and two mediation sessions overseen by Magistrate Judge Speight, which culminated in an agreement in principle. The success in reaching an agreement was based on a well-developed understanding of the factual and legal issues and the involvement of Judge Speight as a mediator. *See In re Outer Banks Power Outage Litig.*, 2018

9

WL 2050141, at *3 ("mediation with a highly experienced mediator" supported finding that settlement was the result of "arms-length negotiations"). These circumstances favor approval.

### 4. Experience of Counsel

Plaintiff's counsel, Relman Colfax PLLC ("Relman Colfax"), is a civil rights law firm based in Washington, D.C., with a national practice. Relman Colfax routinely litigates a wide range of civil rights cases in federal court including many cases, like this one, that involve constitutional claims against government actors, Livengood Decl. ¶ 6, and serves as class counsel for certified class actions, *id.* ¶ 5. Courts have repeatedly found Relman Colfax qualified to serve as class counsel. *See, e.g.*, Walden Tr. (Ex. 5), at 21:25-22:2 ("[C]lass counsel have impressive civil rights and class action litigation experience."); *Moore v. Napolitano*, 926 F. Supp. 2d. 8, 35 (D.D.C. 2013) ("There is no dispute as to whether the plaintiffs' class counsel are appropriate, and there is no indication that class counsel lack the experience and knowledge required to represent the class."). Counsel's experience litigating class actions and constitutional claims gives substantial credence to their representation to the Court herein that the settlement is fair. *See, e.g.*, *Comm'rs of Pub. Works*, 340 F.R.D. at 248.

### B. The Adequacy Factors

#### 1. Relative Strength of Plaintiff's Case on the Merits and Difficulties of Proof or Strong Defenses Likely at Trial

The first two adequacy factors are often addressed in tandem. *See, e.g.*, *Haney v. Genworth Life Ins. Co.*, No. 3:22CV55, 2023 WL 174956, at *6 (E.D. Va. Jan. 11, 2023); Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment (grouping these two factors together). These factors consider "how much the class sacrifices in settling a potentially strong case in light of how much the class gains in avoiding the uncertainty of a potentially difficult case." *Haney*, 2023 WL 174956, at *6 (quoting *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560,

573 (E.D. Va. 2016)). While undersigned counsel are very confident in the strength of their case, Defendants' Motion to Dismiss demonstrates that there are significant legal hurdles to overcome in order to prevail on the merits. Chief among those hurdles is qualified immunity. "[Q]ualified immunity erects a substantial barrier for plaintiffs," *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994), and even if Plaintiff prevails at every stage, because qualified immunity entitles Defendants to interlocutory appeal, *see Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), it will at the very least prolong the litigation and delay Plaintiff's ability to recover.

Furthermore, in order to succeed on the substantive due process and Eighth Amendment claims, Plaintiff would need to show that Defendants acted with "deliberate indifference," that is, they "(1) . . . had 'subjective knowledge of a risk of serious harm, consisting of continued detention when the plaintiff was entitled to be released'; (2) . . . 'disregarded that risk'; and (3) the disregard was by 'conduct that is more than mere negligence.'" *West v. Prince George's Cnty.*, No. 21-0863, 2022 WL 125936, at *5 (D. Md. Jan. 13, 2022) (citation omitted). Because this is a fact-intensive inquiry, Dkt. 20 at 10, Plaintiff would need jurors to find each of these factors. Defendants would likely argue that, at most, they made mistakes in applying the 2022 ESC law, and thus that their state of mind was not sufficient to incur constitutional liability. While Plaintiff disagrees with this characterization, a fact-finder might not.

In short, there would be genuine factual and legal challenges to prevailing in this case, which favors approval of the proposed settlement.

### 2.  Duration and Expense of Additional Litigation

There is no doubt that litigation of this case through discovery, summary judgment, trial, and perhaps multiple appeals would require substantial additional time and expense. Discovery would include depositions of at least both Defendants, other VDOC officials involved in the

implementation of the ESC program, Plaintiff, and other persons formerly in VDOC custody. *See* Livengood Decl. ¶ 15. The Parties would present dueling experts regarding how to value each day of over-detention in light of both general best practices and the particular circumstances of VDOC custody. *Id.* Trial could be lengthy because there are a large number of potential witnesses; the initial disclosures exchanged by the Parties list dozens of people with knowledge of the facts at issue. *Id.* ¶ 8. Throughout all of this, there would be hard-fought motions practice, as indicated by the history of the litigation to date, and perhaps several interlocutory appeals of qualified immunity, *see Mitchell*, 472 U.S. at 530. And "there is little doubt that a jury verdict for either side would . . . usher[] in a new round of litigation in the Fourth Circuit and beyond, thus extending the duration of the case and significantly delaying any relief for plaintiffs." *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 667 (E.D. Va. 2001).

Full litigation, in short, would require several years and millions of dollars in fees and expenses, in addition to the risk of an unfavorable outcome.

### 3. <u>Solvency of Defendant and Likelihood of Recovery on a Litigated Judgment</u>

Plaintiff does not anticipate difficulty collecting a potential judgment from Defendants.

### 4. <u>Degree of Opposition</u>

Named Plaintiff Leslie Puryear supports the proposed settlement, *see* Decl. of L. Puryear (Ex. 4) ¶ 16, and no opposition has been identified, *see* Livengood Decl. ¶ 17. If the instant motion is granted, Plaintiff will address at the final approval hearing any opposition articulated after notice is provided to members of the class.

## C. Reasonableness

As noted above, there is no specific test used to assess reasonableness in the Fourth Circuit, but several relevant factors favor approval of the proposed settlement.

12

1.  **The Size of the Recovery is Reasonable**

The settlement achieves an excellent result for the class, especially in light of the legal and factual obstacles that Plaintiff would otherwise need to overcome and the costs of proceeding through trial and appeal. *See supra* sec. I.B.1–2. The settlement reached here will compensate the approximately 53 class members around $118 per day, or $43,070 per year, of over-detention. *See* Settlement Agmt. ¶ 4.a.i. The absolute amount of the payments will be substantial; no class member will receive less than $1,000, *id.*, and approximately three-fourths of the class will receive more than $10,000, *id.* Ex. A. These class members will not have to obtain and pay counsel, file their own cases, respond to discovery requests, or otherwise bear the burdens of litigation in order to obtain these substantial settlement payments.

Compensation of $43,070 per year of over-incarceration is reasonable under the present circumstances. Virginia law provides that persons who are wrongly incarcerated due to a conviction that is later overturned are entitled to $55,000 per year of over-incarceration, plus attorney's fees. *See* Va. Code Ann. § 8.01-195.11(A)(1), (C). This settlement would provide over 50 formerly incarcerated individuals with a recovery that is approximately 80% of that statutory number, without each person having to litigate their claims and engage with thorny legal issues such as qualified immunity. Moreover, Defendants took the position during negotiations that the $55,000 statutory amount is higher than what class members are entitled to because it is the amount set for people who should not have been incarcerated in the first place. While Plaintiff disputes this argument, a jury or Court might find it persuasive.

The recoveries in analogous cases confirm the reasonableness of the settlement amount. For example, in November 2020, a District Court approved a settlement that compensated a class of individuals who were over-detained by the Los Angeles Sheriff's Department up to $25,000

per person, at a rate of $1,000 per day. *See* Preliminary Approval Order, *Roy v. Los Angeles*, No. 2:12-cv-09012 (C.D. Cal. Nov. 25, 2020), Dkt. 610. Those class members remained in jail "after they were acquitted or otherwise ordered released by a judge, or after serving a jail sentence," *id.* at 1, justifying a higher per-day amount than here, but the $25,000 per-person cap is substantially lower than what many class members here will receive, *see* Settlement Agmt., Ex. A. Similarly, a federal court in the District of Columbia approved a settlement that compensated a class of individuals who had been over-detained and/or strip-searched at the D.C. Jail $370 for the first day of over-detention, and $250 per day thereafter. *See* Class Action Settlement Agmt., *Barnes v. District of Columbia*, No. 1:06-cv-00315 (D.D.C. Nov. 4, 2013), Dkt. 465-2. This multiplies out to $91,370 per year of over-detention, but because the *Barnes* class members were over-incarcerated for days or weeks—rather than the months or years alleged here—most payments to the *Barnes* class members would be, individually, lower than those proposed here. As such, the recovery is well within the bounds of reasonableness.

## 2.  **The Service Payment to Mr. Puryear Is Reasonable**

Fed. R. Civ. P. 23(e)(2)(D) authorizes the payment of incentive awards to named plaintiffs to ensure that the settlement "treats class members equitably relative to each other." *See* William B. Rubenstein, 5 Newberg and Rubenstein on Class Actions § 17:13 (6th ed.) ("To the extent that the class representatives . . . took risks, or protected the class's interests through their work, it is surely equitable to provide them a modest extra payment from the class's recovery."). "The Fourth Circuit has yet to provide clear guidance on the factors to use when assessing the reasonableness of the size of an incentive award," but "several district courts have adopted the test used by the Seventh Circuit that instructs courts to examine 'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefited

from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.'" *Burke v. Shapiro, Brown & Alt, LLP*, No. 3:14CV201, 2016 WL 2894914, at *6 (E.D. Va. May 17, 2016) (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)).

Here, the class members have benefitted tremendously from Mr. Puryear's steadfast work on their behalf, and he should be compensated accordingly. This is an unusual case, where Mr. Puryear's work on behalf of the class began before the instant class action. Mr. Puryear filed a habeas petition challenging the VDOC policy at issue in this case—excluding people serving sentences for inchoate offenses related to robbery and carjacking from earning expanded credits—in September 2023, which caused VDOC to amend its policy and led to the "Puryear Releases" in November 2023. Mr. Puryear and his wife spent many months securing pro bono counsel to litigate the complex legal issues involved and working with counsel to prepare the habeas petition. *See* Puryear Decl. ¶ 8. Because of his impeccable disciplinary record, *see* Complaint, Dkt. 1, ¶¶ 53–54, Mr. Puryear was a particularly well-suited candidate to bring this habeas petition.

After his release, Mr. Puryear could have brought a civil damages action for himself alone; given the amount of time he was over-incarcerated, 434 days—the longest any class member was overincarcerated was 441 days, *see* Settlement Agmt., Exhibit A—he could have sought a significant monetary recovery for himself. Instead, he chose to represent other similarly harmed individuals, knowing that a class action could be more protracted and involve barriers, such as class certification, not present in an individual case. *See* Puryear Decl. ¶ 12.

And though he brought the action on behalf of a class, Mr. Puryear alone bore the risk of retaliation: Mr. Puryear was on supervised release when he filed the complaint, and suing the head of VDOC, who exercised extraordinary control over his life at the time, *see* Puryear Decl. ¶

15

13, made Mr. Puryear vulnerable to retaliation. Courts have recognized that class representatives who expose themselves to a risk of retaliation by suing the defendant are entitled to compensation. *See, e.g.*, *In re Peanut Farmers Antitrust Litig.*, No. 2:19-CV-00463, 2021 WL 9494033 (E.D. Va. Aug. 10, 2021) (approving $40,000 service payment to each of six class representatives, who were farmers suing the processing companies who bought their crops, in part because the farmers "pursued the litigation knowing that Defendants might retaliate against them, thus risking their livelihoods"); *Kelly v. Johns Hopkins Univ.*, No. 1:16-CV-2835, 2020 WL 434473 (D. Md. Jan. 28, 2020) (approving $160,000 in service payments across eight named plaintiffs who "risked their reputation and alienation from employers or peers 'in bringing an action against a prominent company [university] in their community'"). This is especially true where a *sole* named plaintiff puts themselves on the line. *See Binotti v. Duke Univ.*, No. 1:20-CV-470, 2021 WL 5366877, at *5–6 (M.D.N.C. Aug. 30, 2021) (approving $65,000 service payment where plaintiff "put her professional career on the line when she came forward" as sole class representative in case against employer). Such is the case for Mr. Puryear, and his service payment should reflect that.

Moreover, as the sole named Plaintiff, Mr. Puryear took on significant reputational harm. Mr. Puryear left prison, as most people do, eager to put the past behind him, but in service of the lawsuit, he put his convictions in the public eye, responding to press inquiries and speaking publicly about the over-detention.[1] As a result, the nature of his conviction is readily apparent online, in a way that is not true for the 52 other class members. The fact that Mr. Puryear has done publicity on the class's behalf should be reflected in his service payment. *See Matheson v.*

---

[1] *See, e.g.*, Tom Jackman & Laura Vozzella, *Lawsuit: Va. prison leaders kept inmates from early release*, WASH. POST (July 5, 2024), https://www.washingtonpost.com/dc-md-va/2024/07/05/virginia-lawsuit-denial-early-release-puryear/.

*T-Bone Rest., LLC*, No. 09 CIV. 4214 DAB, 2011 WL 6268216, at \*9 (S.D.N.Y. Dec. 13, 2011) ("Media coverage of a class action can benefit the class, and a named plaintiff's involvement in it further supports a service award."); *see also Kelly v. Johns Hopkins Univ.*, 2020 WL 434473, at \*7 (recognizing that the class representatives "risked their reputation and alienation from employers or peers" in filing "an action 'against a prominent [university] in their community'") (quoting *Kruger v. Novant Health, Inc.*, No. 1:14CV208, 2016 WL 6769066, at \*6 (M.D.N.C. Sept. 29, 2016)).

As the litigation progressed, Mr. Puryear met with counsel in person, by video, and telephonically on many occasions to draft the complaint, respond to written discovery requests, and search for and provide documents. He traveled to Richmond to attend the October 28 full-day mediation in person and virtually attended the second mediation. Throughout the mediation process, he offered valuable input and provided approval at each step of the way—advocating not only for his own interests, but those of the whole class. *See* Puryear Decl. ¶¶ 14–15.

In light of these facts, the $40,000 service payment is reasonable. Courts in this Circuit have regularly approved service payments higher than $40,000. *See, e.g.*, *Binotti*, 2021 WL 5366877, at 5-6 (approving $65,000 payment and collecting cases with payments from $85,000 to $300,000 per plaintiff); *In re Titanium Dioxide Antitrust Litig.*, No. 10-CV-00318, 2013 WL 6577029, at \*1 (D. Md. Dec. 13, 2013) (approving $125,000 service payment); *Helmick v. Columbia Gas Transmission*, No. 2:07-cv-00743, 2010 WL 2671506, at \*3 (S.D. W. Va. July 1, 2010) (approving $50,000 service payment in addition to regular distribution from settlement proceeds). A $40,000 service payment is particularly reasonable in light of the size of the payments going to each class member. No class member will receive less than $1,000. *See* Settlement Agmt. ¶ 4.a.i. Approximately half of the class will receive payments in excess of

$20,000. Courts have noted that service payments are appropriate where "the relief to the rest of the class is not 'perfunctory.'" *Binotti*, 2021 WL 5366877, at 6 (quoting *Berry v. Schulman*, 807 F.3d 600, 613-14 (4th Cir. 2015)). And the ratio between Mr. Puryear's service payment and what other class members are receiving is, in most cases, no more than 2:1. Courts have approved service payments at a much higher ratio. *See, e.g.*, *id.* (approving service payment which was 20 times higher than payments to class members). The proposed service payment is reasonable.

### 3.    The Attorneys' Fees and Costs are Reasonable

Plaintiff anticipates seeking an award of up to $400,000 for attorneys' fees and expenses, out of the approximately $1.6 million settlement fund.

While "[t]he Fourth Circuit has not explicitly mandated which method district courts should use," "the favored method for calculating attorneys' fees in common fund cases is the percentage of the fund method. . . . And in a fee shifting case, the award is typically calculated using the lodestar method." *Skochin v. Genworth Fin., Inc.*, No. 3:19-CV-49, 2020 WL 6536140, at *3, 4 (E.D. Va. Nov. 5, 2020). Courts will typically apply "one method as the primary calculation and use the other method as a cross check on the reasonableness of the first." *Id.* at 4.

"Once a figure has been calculated using the percentage of the fund or lodestar method, a court must determine if that result is reasonable." *Id.* Given that the Fourth Circuit has been unclear about whether to apply the 12-factor *Johnson* test from the Fifth Circuit or the seven-factor *Gunter* test from the Third Circuit, this Court has applied "both tests to assess the reasonableness of attorneys' fees calculated using the percentage of the fund method." *Id.* at 6.

The *Johnson* test includes the following twelve factors:

(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's

opportunity costs in pressing the instant litigation; (5) the customary fee for legal work; (6) the attorney's expectations at the outset of litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation[,] and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Id.* at 5 (quoting *Brown*, 318 F.R.D. at 577).

There is significant overlap in the *Gunter* factors, which are:

(1) the results obtained for the class; (2) the quality, skill, and efficiency of the attorneys involved; (3) the complexity and duration of the case; (4) the risk of nonpayment; (5) awards in similar case; (6) objections; and (7) the amount of time devoted to the case by plaintiffs' counsel.

*Id.* (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000)).

These factors favor an award of $400,000, or about one-fourth of the common fund. "[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Doe v. Chao*, 435 F.3d 492, 506 (4th Cir. 2006) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)). Plaintiff's counsel have achieved an extremely successful result here, especially given the difficulty of litigating constitutional damages claims against the government and the vigorous defense mounted by the Office of the Attorney General.

The barriers to prevailing on constitutional claims against the government are significant. In this case, Plaintiff's counsel faced great risk pursuing a legal theory that is not common and devoting hundreds of thousands of dollars' worth of attorney time to a risky lawsuit. *See* Livengood Decl. ¶ 14. Counsel are aware of only one prior lawsuit challenging VDOC's implementation of the new ESC law, and in that case, the Plaintiff lost a motion to dismiss on immunity grounds. *See Swart v. Miyares*, No. 3:23CV753, 2024 WL 466797 (E.D. Va. Jan. 31, 2024). Counsel pursued relief for this Class against that backdrop, distinguishing *Swart* while understanding that it created substantial risk in litigating this case. In light of these challenges,

19

the result here is remarkable: class members will be paid $43,070 per year of over-incarceration, which represents approximately 80% of what people would receive if the government agreed they should never have been incarcerated in the first place, *see* Va. Code Ann. § 8.01-195.11.

The remaining factors likewise support the fee award. Plaintiff's counsel have a longstanding professional relationship with Mr. Puryear; they represented him *pro bono* in filing the habeas petition that secured his release (and prompted the "Puryear Releases"). *See* Livengood Decl. ¶¶ 7, 9. Counsel have devoted significant time to investigating the underlying claims, drafting the complaint, defending against a hard-fought motion to dismiss, propounding and responding to discovery requests, and negotiating a strong settlement for the class. *Id.* ¶ 14. In order to minimize administration costs and maximize the class members' recovery, Plaintiff's counsel have agreed to take on substantial parts of the settlement administration process. *Id.* ¶ 13.

Another court in this District recently commended counsel's experience, reputation, and ability, *see* Walden Tr. at 21:25-22:2 ("[C]lass counsel have impressive civil rights and class action litigation experience."), and noted the risk assumed by counsel in taking on a class-action lawsuit on a contingency basis, *id.* at 22:7–13, ("Very few lawyers can take on the representation of a class client given the investment of time, substantial time, effort and money, especially in light of the risks of recovering nothing."). The undesirability of the case within the legal community is further evinced by the fee-shifting provisions for both § 1983 cases and cases brought under state law regarding wrongful incarceration. *See* 42 U.S.C. § 1988; Va. Code Ann. § 8.01-195.11(A)(1), (C). "[F]ee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain." S. Rep. No. 94–1011, at 2 (amending 42 U.S.C. § 1988 to shift attorney's fees for prevailing civil rights plaintiffs onto government-defendants). Plaintiff's counsel have shown

they are able and willing to bring constitutional claims against powerful state actors such as

VDOC; few others have been willing to do so or capable of achieving similar results.

Fee awards in cases in this Circuit support an award that represents one-fourth of the total

settlement. Courts in the Fourth Circuit routinely award a larger portion of the settlement in

attorneys' fees. *See, e.g.*, *Galloway v. Williams*, No. 3:19-CV-470, 2020 WL 7482191, at *11

(E.D. Va. Dec. 18, 2020) (final approval of 33% of common fund); *Sims v. BB&T Corp.*, No.

1:15-CV-732, 2019 WL 1993519, at *3 (M.D.N.C. May 6, 2019) (same); *Deem v. Ames True

Temper, Inc.*, No. 6:10-CV-01339, 2013 WL 2285972, at *6 (S.D. W. Va. May 23, 2013)

(same); *DeWitt v. Darlington Cnty.*, No. 4:11-CV-00740, 2013 WL 6408371, at *7 (D.S.C. Dec.

6, 2013) (preliminary approval of 33.33% of common fund).

Courts using the percentage method often perform a lodestar cross-check to confirm the

reasonableness of the percentage award. *See, e.g.*, *In re Cook Med., Inc., Pelvic Repair Sys.

Prods. Liab. Litig.*, 365 F. Supp. 3d 685, 701 (S.D. W. Va. 2019). Plaintiff's counsel's lodestar is

already over $400,000. *See* Livengood Decl. ¶ 14. This does not account for the time that

Plaintiff's counsel will spend defending this motion before the Court, administering the

settlement, and seeking final approval. Counsel's recovery will thus be below their lodestar,

while the average lodestar multiplier in this Circuit is 2.43. *See* Theodore Eisenberg & Geoffrey

P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. EMPIRICAL

LEGAL STUD. 248, 272 tbl.14 (2010). Another federal court in this Circuit recently noted the

reasonableness of counsel's billing rates. *See* Walden Tr. at 25:1-5 ("Class counsel's hourly rates

are well within the goalpost of litigators in their general field of their echelon. Further, counsel's

hourly rates are also comfortably within the ranges of rates approved as reasonable in recent

class actions in this circuit . . . .”). In light of these factors, the lodestar multiplier here is reasonable.

In accordance with Fed. R. Civ. P. 23(h) and Fed. R. Civ. P. 54(d)(2), Plaintiff will move for an award of fees in an amount no greater than $400,000 as part of his motion for final approval of the settlement.

## II.    A SETTLEMENT CLASS SHOULD BE PROVISIONALLY CERTIFIED UNDER RULES 23(a), 23(b)(2), and 23(b)(3).

The Settlement Agreement provides that the settlement will be effectuated through class action treatment, and the Parties will support certification for this purpose. *See* Settlement Agmt. ¶¶ 2–3. For a class to be certified, it must meet the requirements of Fed. R. Civ. P. 23. *Jonathan R. v. Just.*, 344 F.R.D. 294, 302 (S.D. W. Va. 2023). This requires that Plaintiff satisfy each of the four criteria provided in Rule 23(a)(1)-(4), but only one of three subcategories of Rule 23(b). *Id.* Courts “‘give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and . . . promote judicial efficiency.’” *Scott v. Clarke*, 61 F. Supp. 3d 569 (W.D. Va. 2014) ((quoting *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003)).

In addition to these explicit requirements of Rule 23, the Fourth Circuit has read in an “implicit threshold requirement that the members of a proposed class be readily identifiable.” *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (citation omitted). This requirement, also known as “ascertainability,” is clearly met here, where the Parties have compiled a list of all potential class members. *See* Settlement Agmt., Ex. A.

### A.    Rule 23(a) is Satisfied

#### 1.    Rule 23(a)(1) – Numerosity

The Parties’ exchange of information during settlement negotiations confirmed that the

22

proposed class is composed of 53 individuals. *See* Settlement Agmt., Ex. A. This easily satisfies Rule 23(a)(1), requiring that "the class is so numerous that joinder of all members is impracticable." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 233–34 (4th Cir. 2021) (finding that a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone).

### 2. **Rule 23(a)(2) – Commonality**

To satisfy commonality, "a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Commonality is present when the claims of class members "depend upon a common contention . . . . [that is] capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. "This does *not* mean, of course, that the entire *case* must be decided by a single issue." *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 200 (E.D. Va. 2015). Moreover, the Fourth Circuit has recognized that "a class action will not be defeated solely because of some factual variances in individual grievances" when there are common questions of law. *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 58 (E.D. Va. 2021), *aff'd sub nom. Williams v. Martorello*, 59 F.4th 68 (4th Cir. 2023) (internal quotation marks and citation omitted).

Here, several common factual and legal questions are central to resolving this dispute and capable of class-wide resolution, satisfying Rule 23(a)(2). These include how Defendants determined which categories of offenses were excluded from expanded ESCs under Va. Code Ann. § 53.1-202.3(A); what Defendants' policy was regarding ESC eligibility for people convicted of inchoate offenses related to robbery and carjacking; what roles VDOC officials played in making, promulgating, and enforcing VDOC policy around ESCs; and whether

Defendants' policy and practice of denying ESCs (and thus release) for inchoate versions of robbery or carjacking violated the substantive or procedural due process protections of the Fourteenth Amendment, the Eight Amendment's prohibition against cruel and unusual punishment, and/or the right to be free from false imprisonment under Virginia law. Cases like this, where Plaintiff's allegations are based on VDOC's "standardized conduct," are especially appropriate for class treatment. *Williams v. Big Picture Loans*, LLC, 339 F.R.D. 46, 61 (E.D. Va. 2021), *aff'd sub nom. Williams v. Martorell*o, 59 F.4th 68 (4th Cir. 2023). Standardized conduct allows key questions—*e.g.*, how did VDOC determine who was eligible for expanded ESCs— to be answered "in one stroke," *Dukes*, 564 U.S. at 350, for the whole class.

### 3.  Rule 23(a)(3) – Typicality

"The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Big Picture Loans, LLC*, 339 F.R.D. at 58 (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006)). Typicality does not mandate that the class representative's claims are identical to those of the class; instead, the representative "must generally be part of the class and have 'the same interest and suffer the same injury as the class members.'" *Id. See also Brown*, 318 F.R.D. at 567.

Mr. Puryear's claims are typical of the Class. Mr. Puryear was incarcerated by Defendants for inchoate offenses related to robbery; engaged in good conduct and program participation; and was subject to prolonged and illegal detention pursuant to Defendants' uniform policy of excluding persons serving sentences for inchoate offenses related to robbery and/or carjacking from the expanded ESC program. *See* Puryear Decl. ¶¶ 2–8. This is precisely what is alleged as to the Class, Compl. ¶¶ 12–20, and satisfies the typicality requirement.

4. **Rule 23(a)(4) – Adequacy of Representation**

"The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." *Sharp Farms v. Speaks*, 917 F.3d 276, 295 (4th Cir. 2019) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). "For a conflict of interest to defeat the adequacy requirement, 'that conflict must be fundamental.'" *Id.* (quoting *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010)); *see also Nelson v. Warner*, 336 F.R.D. 118, 124 (S.D. W. Va. 2020) (noting that "[o]nly conflicts that . . . go to the heart of the litigation prevent a plaintiff from meeting . . . the adequacy requirement").

No conflict, let alone a substantial one, exists between Mr. Puryear and other members of the proposed class. In fact, all share an interest in being compensated for the damages caused by over-detention due to VDOC's uniform policy of denying expanded ESCs to individuals convicted of inchoate offenses related to robbery and/or carjacking.

Class counsel's competence and experience is also a factor in determining adequacy of representation. *Thomas v. FTS USA, LLC*, 312 F.R.D. 407, 419-20 (E.D. Va. 2016). As described above, undersigned counsel have experience in both constitutional and class action litigation. *See* supra sec. I.A.4. By their litigation of this case, *see, e.g.*, Dkt. 20, counsel have demonstrated that they are able and firmly committed to zealously pursuing the class members' interests.

B. **Rule 23(b)(3) is Satisfied**

Classes seeking monetary relief are subject to the certification requirements of Rule 23(b)(3). *Dukes*, 564 U.S. at 362. The class here satisfies Rule 23(b)(3)'s two relevant criteria: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**Predominance.** – The common questions detailed above, *see supra* sec. II.A.2, are the predominant issues pertaining to liability, and the resolution of those questions will serve as the basis for liability determinations as to each of the causes of action at issue. Those common questions predominate over the only potentially individualized issue: damages. "Courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations." *Reed v. Alecto Healthcare Servs., LLC*, 2022 WL 4115858, at *7 (N.D. W. Va. July 27, 2022). This is particularly so here, where the Parties have agreed that individual damages will be determined formulaically according to a per-day amount, a method courts have found appropriate in similar cases. *See Langley v. Coughlin*, 715 F. Supp. 522, 558 (S.D.N.Y. 1989) ("[C]ourts have been perfectly willing, . . . to award *per diem* damages to an inmate unconstitutionally confined.").

**Superiority.** – Rules 23 identifies four (non-exhaustive) factors that are pertinent to this inquiry:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of a litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

*Id.* Subsection (D) is not relevant to a settlement-only class. *Brown*, 318 F.R.D. at 569 ("With settlement classes, . . . courts need not consider the last factor, 'whether the case, if tried, would present intractable management problems, for the proposal that there will be no trial.'") (quoting *Amchem Prod.*, 521 U.S. at 593).

The relevant factors all support certification here. The "dominant[]" purpose of factor (A) is to provide for the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Bicking v. Mitchell Rubenstein & Assocs., P.C.*, No. 3:11CV78, 2011 WL 5325674, at *4 (E.D. Va. Nov. 3, 2011) (quoting *Amchem Prod.*, U.S. at 617); *see also In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D 162 (D.S.C. 2018) (finding that "the vast majority of class members have a de minimis interest in individually controlling the prosecution of their . . . claims because the monetary value of their damages would be dramatically outweighed by the cost of litigation an individual case"). The lack of economic resources and incentives for individual class members to bring their own suits are key considerations, *see Pitt v. City of Portsmouth*, 221 F.R.D. 438, 445-46 (E.D. Va. 2004), both of which are present in this case. People who are incarcerated—as the class members necessarily have been—are disproportionately poor[2] and face significant hurdles in obtaining counsel and bringing private litigation.  Many of the same challenging factual and legal issues identified above, *see supra* sec. I.B.1, would be present in individual, non-class litigation. As described above, a fair individual recovery in this case could be in the tens of thousands of dollars, which would not justify the substantial cost required to demonstrate Defendants' liability for damages. Given the costliness of individual litigation, this factor supports class certification.

As to the factor in subsection (B), Mr. Puryear is unaware of any other litigation concerning the controversy detailed in the complaint. The factor in subsection (C) has been

---

[2] *See* Bernadette Rabuy & Daniel Kopf, *Prisons of Poverty: Uncovering the pre-incarceration incomes of the imprisoned*, PRISON POLICY INITIATIVE (July 9, 2015), https://www.prisonpolicy.org/reports/income.html.

addressed and satisfied because Defendants reside in this District and the events giving rise to the claims occurred within this District. Defs. Answer, Dkt. 19, ¶¶ 21–22.

### C. Plaintiff's Counsel Satisfy Rule 23(g) Requirements

Rule 23(g) requires the Court to appoint class counsel when it certifies a class. Plaintiff's counsel have carefully investigated the potential class claims in this action; have substantial experience in class action litigation, including complex civil rights matters; are knowledgeable about the law relevant to this action; and have committed significant resources to representing the class. *See supra* sec. I.A.4. Accordingly, class counsel fairly and adequately represents the interest of the class. *See* Fed. R. Civ. P. 23(g)(1) & (4).

### III.   THE PROPOSED CLASS NOTICE SHOULD BE DISSEMINATED TO THE CLASS.

Prior to finally approving the proposed settlement, the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Because Plaintiff requests certification (in part) under Rule 23(b)(3), the notice must be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Similarly, due process requires reasonable notice and the opportunity to be heard or withdraw from the class. *See McAdams v. Robinson*, 26 F.4th 149, 157–58 (4th Cir. 2022); *see also Good v. Am. Water Works Co., Inc.*, No. CV 2:14-01374, 2016 WL 5746347, at *9 (S.D. W. Va. Sept. 30, 2016) (explaining that the notice should not be "a long brief of the parties' positions" (citation omitted)).

The Settlement Agreement provides that notice of the settlement will be sent by the Settlement Administrator to the individual class members in the form attached as Exhibit B to the Settlement Agreement via first-class U.S. mail and email. VDOC has social security numbers

28

for all class members and will provide the records necessary to ascertain the identity and last-known contact information of each class member—because almost all class members are on supervised release, VDOC has up-to-date information—and the Parties will seek up-to-date contact information for any class member whose notice is returned undeliverable. *See* Settlement Agmt. ¶ 13. First-class mailing in conjunction with tracing satisfies Rule 23 and due process where, as here, the Parties have addresses, social security numbers, and phone numbers of the class members. *See Thorpe v. Va. Dep't of Corr.*, No. 2:20CV00007, 2023 WL 5038692, at *5 (W.D. Va. Aug. 8, 2023); *Minter v. Wells Fargo Bank, N.A.*, 283 F.R.D. 268, 275 (D. Md. 2012). Emails will make the notice process even more effective. The notice will be provided to class members with adequate time for them to decide if they want to object or opt out. *See* Settlement Agmt. ¶¶ 14–16 (opt-outs, objections, and rescissions due 60, 75, and 90 days after Order for Notice and Hearing, respectively).

The content of the proposed notice is also sufficient. As required under Rule 23(c)(2)(B) and Rule 23(e)(5), it describes the case and terms of settlement, provides the class definition, tells class member that they may appear through an attorney, tells them that they may be excluded from the class or object to the settlement and how to do so, and explains the binding effect of a class judgment on class members. The notice also describes the process by which class members will receive payments and allows them to select a method of payment if the settlement receives final approval. *See* Settlement Agmt., Ex. B.

Because the proposed notice satisfies the requirements of due process and Rule 23, its distribution to the class should be approved.

## IV.    PROPOSED SCHEDULE RELATED TO FINAL APPROVAL

If the Court grants preliminary approval of the proposed settlement, Plaintiff proposes the

following schedule for the remaining procedural steps leading to the Court's final review:

| | |
|---|---|
| Deadline for sending notice to Class Members identified on the basis of VDOC records | 21 days after entry of the Court's order preliminarily approving the settlement |
| Deadline for opting out | 60 days after entry of the Court's order preliminarily approving the settlement |
| Deadline for filing objection | 75 days after entry of the Court's order preliminarily approving the settlement |
| Deadline for rescinding opt-out | 90 days after entry of the Court's order preliminarily approving the settlement |
| Deadline for Plaintiff to file motion for final approval of settlement and to respond to any objections | 100 days after entry of the Court's order preliminarily approving the settlement |
| Final Fairness Hearing | After final motion filing, at the Court's convenience |

This schedule is reflected in the Settlement Agreement and its attachments. If this

schedule is not convenient for the Court, Plaintiff requests that the Court use the same or greater

intervals between each event listed to provide all Parties sufficient time to comply and to provide

class members sufficient time to review the terms of the proposed settlement, consider their

options, and act accordingly.

Date: December 16, 2024

Respectfully Submitted,

/s/ Michael Allen
Michael Allen
Rebecca Livengood*
Ellora Thadaney Israni*
Emahunn Campbell **
RELMAN COLFAX PLLC
1225 19th St. NW Suite 600
Washington, D.C. 20036
Tel: 202-728-1888
Fax: 202-728-0848
mallen@relmanlaw.com
rlivengood@relmanlaw.com
eisrani@relmanlaw.com
ecampbell@relmanlaw.com

*Attorneys for Plaintiff*

*Admitted pro hac vice*

**Pro hac vice application pending*

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2024, a true and correct copy of the foregoing Plaintiff's Memorandum of Law in Support of Plaintiff's Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement, Provisional Certification of Settlement Class, and Approval of Notice was served via CM-ECF on all attorneys of record.


Date: December 16, 2024                    /s/ Michael Allen
                                           Michael Allen

                                           *Attorney for Plaintiff*