**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| LESLIE PURYEAR, *on behalf of himself and all those similarly situated*, | |
| Plaintiff, | |
| v. | Civil Action No. 3:24-cv-00479-REP |
| CHADWICK DOTSON, *in his individual capacity*, | |
| HAROLD CLARKE, *in his individual capacity*, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION
FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, CERTIFICATION OF
SETTLEMENT CLASS, APPROVAL OF ATTORNEY FEE AWARD, AND APPROVAL
OF SERVICE AWARD**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ....................................................................................................................... 2

  I.   THE LITIGATION BETWEEN PLAINTIFF AND VDOC ............................................ 2

  II.  THE MEDIATION AND RESULTING SETTLEMENT AGREEMENT ....................... 4

      A. Monetary Terms of Settlement ................................................................................ 5

      B. Administration of Settlement .................................................................................. 6

      C. Attorneys' Fees ....................................................................................................... 6

  III. PRELIMINARY APPROVAL AND NOTICE ............................................................... 7

ARGUMENT .......................................................................................................................... 7

  I.   FINAL APPROVAL SHOULD BE GRANTED BECAUSE THE SETTLEMENT IS
      FAIR, REASONABLE, AND ADEQUATE. ................................................................. 7

      A. The Fairness Factors ............................................................................................... 9

           1.   Posture of the Case .......................................................................................... 9

           2.   Extent of Discovery ........................................................................................ 9

           3.   Circumstances Surrounding Negotiations ..................................................... 10

           4.   Experience of Counsel .................................................................................. 11

      B. The Adequacy Factors .......................................................................................... 11

           1.   Relative Strength of Plaintiff's Case on the Merits and Difficulties
               of Proof or Strong Defenses Likely at Trial ................................................ 11

           2.   Duration and Expense of Additional Litigation ........................................... 12

           3.   Solvency of Defendant and Likelihood of Recovery on a Litigated Judgment. 13

           4.   Degree of Opposition .................................................................................... 13

      C. Reasonableness ..................................................................................................... 14

           1.   The Size of the Recovery is Reasonable ...................................................... 15

  II.  A SETTLEMENT CLASS SHOULD BE CERTIFIED UNDER RULES 23(a)
      AND 23(b)(3). ............................................................................................................. 16

      A. Rule 23(a) is Satisfied. ........................................................................................ 17

           1.   Rule 23(a)(1) – Numerosity .......................................................................... 17

           2.   Rule 23(a)(2) – Commonality ...................................................................... 17

           3.   Rule 23(a)(3) – Typicality ............................................................................ 18

           4.   Rule 23(a)(4) – Adequacy of Representation ............................................... 19

      B. Rule 23(b)(3) is Satisfied. .................................................................................... 20

      C. Plaintiff's Counsel Satisfy Rule 23(g) Requirements .......................................... 22

i

III. ADEQUATE NOTICE HAS BEEN DISSEMINATED TO THE CLASS. ...................... 22

IV. THE ATTORNEYS' FEES AND COSTS ARE REASONABLE. ................................. 25

    A. Fee as a Percentage of the Fund ................................................................. 27

    B. Lodestar Cross-Check ................................................................................ 28

    C. Degree of Success Obtained (*Gunter* and *Johnson*) .................................. 31

    D. The nature and length of the professional relationship between attorney and client (*Johnson*) .................................................................. 32

    E. The presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel (*Gunter*) ................. 33

    F. The skill and efficiency of the attorneys involved (*Gunter*). The requisite skill required and the experience, reputation, and ability of the attorneys (*Johnson*). ....... 33

    G. The complexity and duration of the litigation and the amount of time devoted to the case by Class Counsel (*Gunter*). The time and labor expended, the novelty and difficulty of the questions, and the requisite skill required (*Johnson*). ............... 34

    H. The risk of nonpayment (*Gunter*). Whether the fee is fixed or contingent (*Johnson*). ............................................................................... 35

    I. Awards in similar cases (*Gunter* and *Johnson*). ......................................... 35

V. THE SERVICE AWARD SOUGHT IS REASONABLE AND SHOULD BE AWARDED. ....................................................................................................... 36

    A. Work Done on Behalf of the Class and Willingness to Act as a Private Attorney General ......................................................................................................... 36

    B. Financial or Reputational Risk ................................................................... 38

    C. The Size of the Award ................................................................................ 39

    D. No Conflict Between Mr. Puryear and the Class ......................................... 40

CONCLUSION ................................................................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                              **Page(s)**

*In re A.H. Robins Co., Inc.*,
    88 B.R. 755 (E.D. Va. 1988) ...................................................................................................9

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ...................................................................................................19, 21

*Archbold v. Wells Fargo Bank, N.A.*,
    No. 3:13-CV-24599, 2015 WL 4276295 (S.D. W. Va. July 14, 2015) ..................................10

*Barber v. Kimbrell's, Inc.*,
    577 F.2d 216 (4th Cir. 1978) .................................................................................................27

*Barnes v. District of Columbia*,
    No. 1:06-cv-00315 (D.D.C. Nov. 4, 2013) ............................................................................16

*Berry v. Schulman*,
    807 F.3d 600 (4th Cir. 2015) ...........................................................................................36, 40

*Bicking v. Mitchell Rubenstein & Assocs., P.C.*,
    No. 3:11CV78, 2011 WL 5325674 (E.D. Va. Nov. 3, 2011) .................................................21

*Binotti v. Duke University*,
    No. 1:20-cv-470, 2021 WL 5366877 (M.D.N.C. Aug. 30, 2021) .........................28, 38, 39, 40

*Brown v. Transurban USA, Inc.*,
    318 F.R.D. 560 (E.D. Va. 2016) ..........................................................................12, 19, 21, 27

*Burke v. Shapiro, Brown & Alt, LLP*,
    No. 3:14CV201, 2016 WL 2894914 (E.D. Va. May 17, 2016) .............................................36

*Camarlinghi v. Santa Clara Cnty.*,
    No. 5:21-CV-03020, 2022 WL 17740464 (N.D. Cal. Dec. 16, 2022) ...................................35

*Carroll v. Northampton Rests., Inc.*,
    No. 2:21-CV-115, 2024 WL 1223442 (E.D. Va. Mar. 21, 2024) ..........................................10

*Commissioners of Pub. Works of City of Charleston v. Costco Wholesale Corp.*,
    340 F.R.D. 242 (D.S.C. 2021) ..........................................................................................8, 11

*Cook v. Niedert*,
    142 F.3d 1004 (7th Cir. 1998) ...............................................................................................36

*Deiter v. Microsoft Corp.*,
    436 F.3d 461 (4th Cir. 2006) ...........................................................................................18, 19

i

*Doe v. Chao*,
    435 F.3d 492 (4th Cir. 2006) ................................................................31

*Driver v. Marion Cnty. Sheriff*,
    No. 14-cv-02076 (S.D. Ind. Aug. 8, 2022), Dkt. 539 .............................35

*EQT Prod. Co. v. Adair*,
    764 F.3d 347 (4th Cir. 2014) ................................................................17

*Farrar v. Hobby*,
    506 U.S. 103 (1992) ..............................................................................31

*Flinn v. FMC Corp.*,
    528 F.2d 1169 (4th Cir. 1975) ........................................................14, 33

*Galloway v. Williams*,
    No. 3:19-CV-470, 2020 WL 7482191 (E.D. Va. Dec. 18, 2020) ...........8, 26, 27, 28

*Gilead Community Svcs., Inc. v. Town of Cromwell*,
    432 F. Supp. 3d 46 (D. Conn. 2019) ..............................................29, 35

*Goodwin v. Dist. of Columbia*,
    No. 21-806, 2025 WL 637467 (D.D.C. Feb. 27, 2025) ..........................34

*Gunnells v. Healthplan Servs., Inc.*,
    348 F.3d 417 (4th Cir. 2003) ................................................................17

*Gunter v. Ridgewood Energy Corp.*,
    223 F.3d 190 (3d Cir. 2000) ...........................................................26, 31

*Haney v. Genworth Life Ins. Co.*,
    No. 3:22CV55, 2023 WL 174956 (E.D. Va. Jan. 11, 2023) ..............11, 12, 28

*Helmick v. Columbia Gas Transmission*,
    No. 2:07-cv-743, 2010 WL 2671506 (S.D. W. Va. July 1, 2010) ............38

*Hicks v. Ferreyra*,
    396 F. Supp. 3d 564 (D. Md. 2019) ......................................................34

*In re High-Tech Employee Antitrust Litig.*,
    No. 11-cv-2509, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ..............39

*Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    855 F. Supp. 825 (E.D.N.C. 1994) .........................................................9

*In re Interior Molded Doors Antitrust Litig.*,
    No. 3:18CV718, 2020 WL 7259153 (E.D. Va. Dec. 10, 2020) .................8

*In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*,
  No. 3:18-CV-00850, 2021 WL 5195089 (E.D. Va. July 27, 2021).........................................38

*In re Jiffy Lube Secs. Litig.*,
  927 F.2d 155 (4th Cir. 1991) ....................................................................................7, 8, 9, 10

*Johnson v. Georgia Highway Exp., Inc.*,
  488 F.2d 714 (5th Cir. 1974) ...............................................................................................26, 31

*Jonathan R. v. Just.*,
  344 F.R.D. 294 (S.D. W. Va. 2023)........................................................................................16

*Kernats v. O'Sullivan*,
  35 F.3d 1171 (7th Cir. 1994) ................................................................................................12

*Kirven v. Cent. States Health & Life Co. of Omaha*,
  No. CA 3:11-2149, 2015 WL 1314086 (D.S.C. Mar. 23, 2015) ...........................................10

*Langley v. Coughlin*,
  715 F. Supp. 522 (S.D.N.Y. 1989) ......................................................................................20

*Lomascolo v. Parsons Brinckerhoff, Inc.*,
  No. 1:08CV1310, 2009 WL 3094955 (E.D. Va. Sept. 28, 2009) ............................................9

*Matheson v. T-Bone Rest., LLC*,
  No. 09 CIV. 4214 DAB, 2011 WL 6268216 (S.D.N.Y. Dec. 13, 2011) ................................38

*McAdams v. Robinson*,
  26 F.4th 149 (4th Cir. 2022) ................................................................................................23

*In re MicroStrategy, Inc. Sec. Litig.*,
  148 F. Supp. 2d 654 (E.D. Va. 2001) ..................................................................................13

*Minter v. Wells Fargo Bank, N.A.*,
  283 F.R.D. 268 (D. Md. 2012)..............................................................................................25

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985)..........................................................................................................12, 13

*Moore v. Napolitano*,
  926 F. Supp. 2d. 8 (D.D.C. 2013) ....................................................................................11, 34

*Nelson v. Warner*,
  336 F.R.D. 118 (S.D. W. Va. 2020)......................................................................................19

*In re Outer Banks Power Outage Litig.*,
  2018 WL 2050141 ...............................................................................................................11

iii

*Pitt v. City of Portsmouth*,
   221 F.R.D. 438 (E.D. Va. 2004) ..........................................................................21

*Reed v. Alecto Healthcare Servs., LLC*,
   2022 WL 4115858 (N.D. W. Va. July 27, 2022)...................................................20

*Reynolds v. Fid. Invs. Institutional Operations Co., Inc.*,
   No. 1:18-CV-423, 2020 WL 92092 (M.D.N.C. Jan. 8, 2020) ...............................39

*Roy v. Los Angeles*,
   No. 2:12-cv-09012 (C.D. Cal. Nov. 25, 2020) ......................................................16

*Scott v. Clarke*,
   61 F. Supp. 3d 569 (W.D. Va. 2014) .....................................................................17

*Sharp Farms v. Speaks*,
   917 F.3d 276 (4th Cir. 2019) ................................................................................19

*Skochin v. Genworth Fin., Inc.*,
   No. 3:19-cv-49, 2020 WL 6536140 (E.D. Va. Nov. 5, 2020) ........................ *passim*

*Soutter v. Equifax Info. Servs., LLC*,
   307 F.R.D. 183 (E.D. Va. 2015) ............................................................................17

*Swart v. Miyares*,
   No. 3:23-cv-753, 2024 WL 466797 (E.D. Va. Jan. 31, 2024)................................34

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
   325 F.R.D. 162 (D.S.C. 2018) ..............................................................................21

*In re The Mills Corp. Secs. Litig.*,
   265 F.R.D. 246 (E.D. Va. 2009) ..............................................................8, 9, 10, 27

*Thomas v. FTS USA, LLC*,
   312 F.R.D. 407 (E.D. Va. 2016) ............................................................................19

*Thorpe v. Va. Dep't of Corr.*,
   No. 2:20-cv-00007, 2023 WL 5038692 (W.D. Va. Aug. 8, 2023)........................25

*Troncelliti v. Minolta Corp.*,
   666 F. Supp. 750 (D. Md. 1987)......................................................................13, 33

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011).....................................................................................17, 18, 20

*Ward v. Dixie Nat. Life Ins. Co.*,
   595 F.3d 164 (4th Cir. 2010) ................................................................................19

*West v. Prince George's Cnty.*,
No. 21-0863, 2022 WL 125936 (D. Md. Jan. 13, 2022)........................................................12

*Williams v. Big Picture Loans, LLC*,
339 F.R.D. 46 (E.D. Va. 2021) ........................................................................................18

*In re Zetia (Ezetimibe) Antitrust Litig.*,
7 F.4th 227 (4th Cir. 2021) ...............................................................................................17

**Statutes**

42 U.S.C. § 1983 ......................................................................................................................3

Va. Code Ann. § 8.01-195.11 ..........................................................................................15, 32

Va. Code Ann. § 53.1-202.3(A)............................................................................................2, 18

Class Action Fairness Act, 28 U.S.C. § 1715 ........................................................................25

**Rules**

Fed. R. Civ. P. 23 ....................................................................................................11, 20, 22, 23

**Other Authorities**

Bernadette Rabuy & Daniel Kopf, *Prisons of Poverty: Uncovering the pre-
incarceration incomes of the imprisoned*, PRISON POLICY INITIATIVE
(July 9, 2015), https://www.prisonpolicy.org/reports/income.html......................................22

Tom Jackman & Laura Vozzella, *Lawsuit: Va. prison leaders kept inmates from
early release*, WASH. POST (July 5, 2024) ...........................................................................38

## PRELIMINARY STATEMENT

Plaintiff Leslie Puryear respectfully submits this memorandum in support of his unopposed motion for an order, pursuant to Federal Rule of Civil Procedure 23, (1) approving the proposed Settlement Agreement, Dkt. 55-1; (2) certifying a settlement class; (3) approving the attorneys' fee award; and (4) approving the service award to Mr. Puryear.

After vigorous advocacy and negotiation, Plaintiff and Defendants Chadwick Dotson and Harold Clarke (collectively, "the Parties") agreed to settle the claims in this case. The proposed Settlement Agreement provides significant monetary relief to a proposed class of 52 people whom Plaintiff alleges were over-detained pursuant to Virginia Department of Corrections ("VDOC") policy. The Parties negotiated the Settlement Agreement, which they believe achieves a fair and adequate resolution, during a mediation conducted by Magistrate Judge Summer L. Speight.

On January 29, 2025, the Court granted preliminary approval of the Settlement, provisionally certified the settlement class, appointed undersigned counsel to represent the settlement class, and directed that notice be given to class members. Dkt. 56 ("Preliminary Approval Order"). Tracking by the settlement administrator of bounced emails and returned mail shows that the individualized notice program was highly effective. Decl. of A. Lange (Ex. 1) ¶ 13. No one has opted out of the class, *see* Dkt. 57, and only one objection was filed, *see* Dkt. 59. Another class member mailed an objection to Plaintiff's counsel but then asked that it be withdrawn, *see* Dkt. 58. Plaintiff now respectfully submits, and all Parties agree, that the Settlement merits final approval by this Court.

1

## BACKGROUND

## I.    THE LITIGATION BETWEEN PLAINTIFF AND VDOC

In 2020, the Virginia General Assembly amended the state's earned sentence credit ("ESC") program to increase the number of credits people in VDOC custody could earn for good behavior and program participation. One ESC amounts to one day deducted from the person's sentence, and previously, a person in custody could earn up to 4.5 ESCs for every 30 days in prison. The 2020 law allowed everyone in VDOC custody to earn up to 15 ESCs for every 30 days unless they were serving sentences for a list of excluded offenses enumerated in the statute, in which case they could earn a maximum of 4.5 ESCs for every 30 days served. *See* Va. Code § 53.1-202.3(A)(1)–(17). The new law went into effect on July 1, 2022, and applied retroactively.

One of the enumerated, excluded offenses is "Robbery under § 18.2-58 or carjacking under § 18.2-58.1." Va. Code § 53.1-202.3(A)(9). Mr. Puryear, who was serving a sentence for *attempted* robbery, was initially told he would receive expanded ESCs and be released soon after July 1, 2022. But before the law went into effect, VDOC reversed its policy, apparently by interpreting § 53.1-202.3(A)(9) to exclude people, like Mr. Puryear, who were serving sentences for inchoate offenses associated with robbery and carjacking.

Mr. Puryear, who maintained his entitlement to expanded ESCs, filed a petition for a writ of habeas corpus in September 2023. Before the Virginia Supreme Court could rule on his petition, in November 2023, VDOC reversed its policy, retroactively granting Mr. Puryear and others serving sentences for inchoate offenses related to robbery and carjacking expanded ESCs and releasing those who, like Mr. Puryear, were immediately eligible for release. This group included 30 people, whom VDOC referred to in internal documents as the "Puryear Releases." Dkt. 47-2 (Livengood Prelim. Appr. Decl.) ¶ 9.

2

Between September 1, 2022, when VDOC's obligation to grant expanded ESCs began, and November 2023, when the "Puryear Releases" occurred, 23 additional people serving sentences for inchoate offenses related to robbery and carjacking were denied expanded ESCs and were released on their release dates as calculated without enhanced credits, sometime after September 1, 2022, but prior to November 2023. Had VDOC not excluded these individuals from expanded ESCs, they would have been released sooner.

On June 29, 2024, Mr. Puryear filed a putative class action on behalf of himself and all others who had been serving sentences in VDOC custody for inchoate offenses related to robbery or carjacking and who were incarcerated for longer than they would have been had VDOC not excluded them from expanded ESCs prior to November 2023. *See* Dkt. 1. Mr. Puryear asserted claims under 42 U.S.C. § 1983 for violations of substantive and procedural due process under the Fourteenth Amendment and for cruel and unusual punishment under the Eighth Amendment, as well as for false imprisonment under Virginia law, against the current and former Directors of VDOC—Dotson and Clarke, respectively.

Defendants moved to dismiss, Dkt. 17, Plaintiff responded, Dkt. 20, and Defendants replied, Dkt. 21. Before the Court ruled on the motion, it ordered the Parties to begin exchanging discovery. *See* Dkt. 23. The Court also held a status conference on September 18, 2024, where the Parties agreed that mediation might be productive, and the Court ordered mediation with Magistrate Judge Summer L. Speight. *See* Dkt. 30. Following that conference and before mediation, the Parties exchanged written discovery requests, produced documents, and began consulting with potential experts. *See* Decl. of R. Livengood (Ex. 2) ¶ 9; Dkt. 47-2 at ¶ 8.

## II.    THE MEDIATION AND RESULTING SETTLEMENT AGREEMENT

In preparation for mediation, the Parties exchanged discovery requests and responses, prepared mediation statements, and exchanged written settlement offers. *See* Dkt. 47-2 at ¶ 8–12. Defendants provided Plaintiff with a list of potential class members, VDOC policy documents regarding the ESC program, internal emails regarding the Puryear Releases, and thousands of emails Mr. Puryear sent and received while incarcerated. *Id.* ¶¶ 8–10. The Parties participated in a full-day mediation with Judge Speight on October 28, 2024, and another half-day session on November 1, 2024. *Id.* ¶ 12. The Settlement Agreement is the result of these negotiations.

The Parties have agreed, through the Settlement Agreement, to seek certification of a Settlement Class consisting of any individual in the custody of VDOC as of July 1, 2022 serving a sentence for an inchoate crime associated with robbery or carjacking; who was not awarded expanded ESCs on those inchoate offenses under Virginia Code § 53.1-202.3(B), as amended; who was released from VDOC custody on or before November 30, 2023; and who would have been released earlier than they were had they been awarded expanded ESCs as of July 1, 2022. "Class Member" is limited to those individuals who were excluded from earning expanded ESCs solely because of an inchoate robbery and/or carjacking offense. *See* Settlement Agmt. ¶ 1(c). The Parties understand that there are 52 class members.[1] Their identities and the number of days they served past their release dates as calculated with expanded ESCs (*i.e.*, number of days of over-detention) are contained in Exhibit A to the Settlement Agreement. Based on the information exchanged during discovery, the Parties believe that Exhibit A is a comprehensive

---

[1] When the Parties entered into the Settlement Agreement, there were 53 class members. Prior to preliminary approval, one class member, Jason Ellington, settled his claim in order to receive credit for the period in which he had been over-detained and secure an earlier release on the sentence he was then serving. Dkt. 55-1 (Ex. A to Settlement Agmt.) at 5.

list of class members.

### A. Monetary Terms of Settlement

The settlement fund currently has a value of up to $1,590,018, which includes the

following:

- $1,130,018 in payments to settlement class members, who will be compensated according to how many days they were over-detained at a rate of $118 per day, or $43,070 per year, of over-detention, plus compensation of $1,000 for the three class members whose award would otherwise be less than $1,000;[2]

- Up to $40,000 as a service payment to Mr. Puryear, for his work as Named Plaintiff, subject to Court approval;

- Up to $20,000 or actual costs to the Settlement Administrator for the costs of administering the notice and distribution process; and

- Up to $400,000 in attorneys' fees to Plaintiff's counsel, subject to Court approval.

*See* Settlement Agmt., Dkt. 55-1, at ¶ 4.

This is not a claims-made settlement; any class member who did not opt-out during the

notice period will receive a payment and will be bound by the terms of the Agreement. The

anticipated payment to each class member is listed in Exhibit A to the Settlement Agreement.

After final approval, Defendants will deposit the final value of the cash payments—$1,130,018

into an escrow account. *See* Settlement Agmt. ¶ 4.a.i. Defendants will also deposit $40,000,

---

[2] At the time of settlement, this amount was set at $1,139,694, and the Parties agreed that this amount would be reduced by the per-day share of any class member who opted out or settled his claims with Defendants prior to the notice period. No class member opted out. As described above, prior to preliminary approval, one class member, Mr. Ellington, did settle his claim in order to receive credit for the period of over-detention and secure an earlier release on the sentence he was then serving. His award would have been $9,676. The Parties also agreed that because one class member, Jorge Jovel, was deported shortly after he was released from VDOC custody, they would make best efforts to contact Mr. Jovel during the notice period, but if they could not, Defendants would not be responsible for funding Mr. Jovel's share of the fund. Plaintiff's counsel was able to locate Mr. Jovel in Guatemala and arrange for him to receive a payment through the settlement administrator. As a result, the amount set for class compensation is now the original amount ($1,139,694) less Mr. Ellington's share ($9,676), or $1,130,018.

5

intended as a service payment to Mr. Puryear, into the account. *Id.* ¶ 4.b. If the Court approves a service payment of less than $40,000, the difference between the amount approved and $40,000 will be distributed among the class members in proportion to how many days each class member was over-detained. *Id.*

### B. Administration of Settlement

The Settlement Agreement provides that Defendants will pay up to $20,000 in administration costs, and Settlement Services, Inc. ("SSI") has been retained as Settlement Administrator to distribute the notice, answer questions from class members, issue payments, prepare tax documents, and otherwise administer the settlement. SSI is an experienced class action settlement administrator. *See* Dkt. 47-3 (Decl. of R. Hyte) ¶¶ 2–3. SSI agreed to administer it for no more than $20,000, *id.* ¶ 6. Plaintiff's counsel agreed to work to support settlement administration to ensure that costs do not exceed $20,000. *See* Dkt. 47-2 ¶ 13. As described below, Plaintiff's counsel has spent approximately $40,000 in attorney and staff time communicating with class members to ensure that class members receive notice and understand their rights under the settlement. *See* Livengood Decl. at ¶¶ 20–21. These efforts have included in-hand delivery by attorneys and staff to two class members and one class member's family member and an extensive and ultimately successful effort to locate Mr. Jovel in Guatemala. *Id*. ¶ 18–20.

### C. Attorneys' Fees

Under the terms of the Settlement Agreement, Defendants will not oppose Plaintiff's Counsel's request to the Court for up to $400,000 in attorneys' fees. *See* Settlement Agmt. ¶ 4(c). This figure represents approximately 25% of the total Settlement Fund. Defendants will be responsible for funding only the amount the Court approves in attorneys' fees; if the Court

approves less than $400,000, the difference between $400,000 and the approved amount will not become part of the fund for class members. *Id.*

## III.    PRELIMINARY APPROVAL AND NOTICE

On January 29, 2025, the Court granted preliminary approval of the Settlement, provisionally certified the settlement class, appointed undersigned counsel to represent the settlement class, and directed that notice be given to class members. Dkt. 56, Preliminary Approval Order. Pursuant to the Court's directive, the Parties began the notice process, engaging SSI as the settlement administrator and providing the information needed for notice. As described below, tracking by SSI of indicates that the individualized notice program was highly effective. Lange Decl. ¶ 13. No one has opted out of the class, *see* Dkt. 57, and only one objection was filed, *see* Dkt. 59. Another class member mailed an objection to Plaintiff's counsel but then asked that it be withdrawn, *see* Dkt. 58. Plaintiff now respectfully submits, and all Parties agree, that the Settlement merits final approval by this Court.

## ARGUMENT

The Settlement Agreement is a fair, reasonable, and adequate resolution of the matter that provides substantial and meaningful relief to members of the Class, results from extensive litigation and arm's-length negotiation by experienced counsel and takes account of the complexity and risks at issue in this litigation.

## I.    FINAL APPROVAL SHOULD BE GRANTED BECAUSE THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.

Approval of a proposed class action settlement typically proceeds in two steps. *See In re Jiffy Lube Secs. Litig.*, 927 F.2d 155, 158–59 (4th Cir. 1991) ("*Jiffy Lube*"). First, the Court grants preliminary approval if it finds probable cause that the proposed settlement is "within the range of permissible settlements that meet the standards of fairness, reasonableness, and

7

adequacy." *In re Interior Molded Doors Antitrust Litig.*, No. 3:18CV718, 2020 WL 7259153, at

*5 (E.D. Va. Dec. 10, 2020). Second, after notice of the settlement is provided to the Class and

the Court conducts a fairness hearing, the Court determines whether the settlement is "fair,

reasonable and adequate," as required under Fed. R. Civ. P. 23(e)(2), such that final approval

should be granted. *See Galloway v. Williams*, No. 3:19-CV-470, 2020 WL 7482191, at *4 (E.D.

Va. Dec. 18, 2020).

The Fourth Circuit applies a four-factor fairness inquiry and a five-factor adequacy

inquiry in determining whether a class action settlement should be approved. *See, e.g.*, *Jiffy

Lube*, 927 F.2d at 158–59; *Galloway*, 2020 WL 7482191 at 4. No specific test is considered in

assessing reasonableness. *See, e.g.*, *In re The Mills Corp. Secs. Litig.*, 265 F.R.D. 246, 258 (E.D.

Va. 2009). The fairness factors are:

> (1) the posture of the case at the time the proposed settlement was reached, (2) the extent
> of discovery that had been conducted, (3) the circumstances surrounding the settlement
> negotiations, and (4) counsel's experience in the type of case at issue.

*Commissioners of Pub. Works of City of Charleston v. Costco Wholesale Corp.*, 340 F.R.D. 242,

249 (D.S.C. 2021) ("*Comm'rs of Pub. Works*") (citing *Jiffy Lube*, 927 F.2d at 158–59); *see also

Galloway*, 2020 WL 7482191 at 4. The adequacy factors are:

> (1) the relative strength of the case on the merits, (2) any difficulties of proof or strong
> defenses the plaintiff and class would likely encounter if the case were to go to trial, (3)
> the expected duration and expense of additional litigation, (4) the solvency of the
> defendants and the probability of recovery on a litigated judgment, [and] (5) the degree of
> opposition to the proposed settlement[.]

*Id.* (citing *Jiffy Lube*, 927 F.2d at 159); *see also Galloway*, 2020 WL 7482191 at 4.

Consideration of these factors and the reasonableness factors demonstrates that the

proposed settlement should receive final approval from the Court.

8

**A.  The Fairness Factors**

**1.  Posture of the Case**

This factor addresses principally "how far the case has come from its inception." *Mills*, 265 F.R.D. at 254. Settlement at a very early stage may suggest "collusion among the settling parties," such that the proposed settlement is not legitimate. *Jiffy Lube*, 927 F.2d at 159; *see also Mills*, 265 F.R.D. at 254. Here, Defendants filed a motion to dismiss, Dkt. 17, which Plaintiff strongly opposed, Dkt. 20, and the Parties engaged in written discovery, exchanging dozens of interrogatories, document requests, and responses, *see* Dkt. 47-2 ¶ 8. The vigorous litigation of the motion to dismiss demonstrates a clear lack of collusion, and the exchange of written discovery evinces the Parties' intent to litigate this case fully and aggressively absent a reasonable settlement. At the same time, this settlement was reached early enough that class members were able to "choose to be included or excluded [from the class] based on the terms of the proposed settlement"; in other words, they did not have to "decide whether to opt-in or opt-out of the class without knowledge of the proposed settlement." *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 855 F. Supp. 825, 829 (E.D.N.C. 1994). As such, the posture of this case favors approval of the settlement.

**2.  Extent of Discovery**

This factor weighs in favor of approval where the parties have conducted "[s]ufficient discovery to permit counsel and the parties to fairly evaluate the liability and financial aspects of a case." *In re A.H. Robins Co., Inc.*, 88 B.R. 755, 760 (E.D. Va. 1988). *See also Lomascolo v. Parsons Brinckerhoff, Inc.*, No. 1:08CV1310, 2009 WL 3094955, at *11 (E.D. Va. Sept. 28, 2009). Such is the case here. Both Parties produced initial disclosures and issued and responded to interrogatories and requests for production of documents, Dkt. 47-2 at ¶ 8, allowing them to enter mediation with a shared sense of the number of potential class members and scope of over-

9

detention, *id.* ¶¶ 10–11, and thereby to assess and negotiate a damages amount. *See Carroll v. Northampton Rests., Inc.*, No. 2:21-CV-115, 2024 WL 1223442, at *4 (E.D. Va. Mar. 21, 2024) (extent of discovery factor weighed in favor of approval where information exchanged in discovery "proved useful because it provided a basis for calculating damages and reaching a reasonable settlement"). During mediation, the Parties also informally exchanged additional information—for example, Plaintiff's Counsel gave Defendants information regarding their fees accrued this far, and the Parties jointly reviewed records to come to a final understanding of the number of class members and length of over-detention, reflected in Exhibit A to the Settlement Agreement. *See Jiffy Lube*, 927 F.2d at 159 (exchange of informal discovery counsels in favor of settlement approval). Between formal and informal discovery and the motion to dismiss briefing—which allowed the Parties to assess the arguments regarding qualified immunity, the primary legal issue in this case—the Parties' communications narrowed points of disagreement and allowed for informed settlement negotiations. This factor favors approval.

### 3.  Circumstances Surrounding Negotiations

This factor serves to ensure that the settlement is the result of arm's-length negotiations based on counsel's informed understanding of the case. *See Mills*, 265 F.R.D. at 255. "Absent evidence to the contrary, the Court should presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion." *Archbold v. Wells Fargo Bank, N.A.*, No. 3:13-CV-24599, 2015 WL 4276295, at *2 (S.D. W. Va. July 14, 2015); *Kirven v. Cent. States Health & Life Co. of Omaha*, No. CA 3:11-2149, 2015 WL 1314086, at *5 (D.S.C. Mar. 23, 2015) (same). The circumstances here include a vigorously contested motion to dismiss; the exchange of formal discovery; and two mediation sessions overseen by Judge Speight, which culminated in an agreement in principle. The success in reaching an agreement

was thus based on a well-developed understanding of the factual and legal issues and the involvement of Judge Speight as a mediator. *See In re Outer Banks Power Outage Litig.*, 2018 WL 2050141, at *3 ("mediation with a highly experienced mediator" supported finding that settlement was the result of "arms-length negotiations"). These circumstances favor approval.

### 4.  Experience of Counsel

Plaintiff's counsel, Relman Colfax PLLC ("Relman Colfax"), is a civil rights law firm based in Washington, D.C., with a national practice. Relman Colfax routinely litigates a wide range of civil rights cases in federal court including many cases, like this one, that involve constitutional claims against government actors, Dkt. 47-2 at ¶ 6, and serves as class counsel for certified class actions, *id.* ¶ 5. Courts have repeatedly found Relman Colfax qualified to serve as class counsel. *See, e.g.*, Dkt. 47-5 (Walden Tr.), at 21:25-22:2 ("[C]lass counsel have impressive civil rights and class action litigation experience."); *Moore v. Napolitano*, 926 F. Supp. 2d 8, 35 (D.D.C. 2013) ("There is no dispute as to whether the plaintiffs' class counsel are appropriate, and there is no indication that class counsel lack the experience and knowledge required to represent the class."). Counsel's experience litigating class actions and constitutional claims gives substantial credence to their representation to the Court herein that the settlement is fair. *See, e.g.*, *Comm'rs of Pub. Works*, 340 F.R.D. at 248.

### B.  The Adequacy Factors

### 1.  Relative Strength of Plaintiff's Case on the Merits and Difficulties of Proof or Strong Defenses Likely at Trial

The first two adequacy factors are often addressed in tandem. *See, e.g.*, *Haney v. Genworth Life Ins. Co.*, No. 3:22CV55, 2023 WL 174956, at *6 (E.D. Va. Jan. 11, 2023); Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment (grouping these two factors together). These factors consider "how much the class sacrifices in settling a potentially strong

case in light of how much the class gains in avoiding the uncertainty of a potentially difficult case." *Haney*, 2023 WL 174956, at *6 (quoting *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 573 (E.D. Va. 2016)). While undersigned counsel are very confident in the strength of their case, Defendants' Motion to Dismiss demonstrates that there are significant legal hurdles to overcome in order to prevail on the merits. Chief among those hurdles is qualified immunity. "[Q]ualified immunity erects a substantial barrier for plaintiffs," *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994), and even if Plaintiff prevails at every stage, because qualified immunity entitles Defendants to interlocutory appeal, *see Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), it can at least prolong the litigation and delay the ability of the class to recover damages.

Furthermore, in order to succeed on the substantive due process and Eighth Amendment claims, Plaintiff would need to show that Defendants acted with "deliberate indifference," that is, they "(1) . . . had 'subjective knowledge of a risk of serious harm, consisting of continued detention when the plaintiff was entitled to be released'; (2) . . . 'disregarded that risk'; and (3) the disregard was by 'conduct that is more than mere negligence.'" *West v. Prince George's Cnty.*, No. 21-0863, 2022 WL 125936, at *5 (D. Md. Jan. 13, 2022) (citation omitted). Because this is a fact-intensive inquiry, Dkt. 20 at 10, Plaintiff would need jurors to find each of these factors. Defendants would likely argue that, at most, they made mistakes in applying the 2022 ESC law, and thus that their state of mind was insufficient for liability. While Plaintiff disagrees with this characterization, a fact-finder might not.

In short, there would be genuine factual and legal challenges to prevailing in this case, which favors approval of the proposed settlement.

## 2.  Duration and Expense of Additional Litigation

There is no doubt that litigation of this case through discovery, summary judgment, trial,

and perhaps multiple appeals would require substantial additional time and expense. Discovery would include depositions of at least both Defendants, other VDOC officials involved in the implementation of the ESC program, Plaintiff, and other persons formerly in VDOC custody. *See* Dkt. 47-2 ¶ 15. The Parties would present dueling experts regarding how to value each day of over-detention in light of both general best practices and the particular circumstances of VDOC custody. *Id.* Trial could be lengthy because there are a large number of potential witnesses; the initial disclosures exchanged by the Parties list dozens of people with knowledge of the facts at issue. *Id.* ¶ 8. Throughout all of this, there would be hard-fought motions practice, as indicated by the history of the litigation to date, and perhaps several interlocutory appeals of qualified immunity, *see Mitchell*, 472 U.S. at 530. And "there is little doubt that a jury verdict for either side would . . . usher[] in a new round of litigation in the Fourth Circuit and beyond, thus extending the duration of the case and significantly delaying any relief for plaintiffs." *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 667 (E.D. Va. 2001).

Full litigation, in short, would require several years and millions of dollars in fees and expenses, along with the risk of an unfavorable outcome. For a class of people who were recently released from prison, such delay would meaningfully diminish the benefit of the recovery.

### 3. Solvency of Defendant and Likelihood of Recovery on a Litigated Judgment

Plaintiff does not anticipate difficulty collecting a potential judgment from Defendants.

### 4. Degree of Opposition

Only one class member has filed an objection. *See* J. Gauzza Objection, Dkt. 59. As an initial matter, this "almost complete absence of opposition to the settlement" agreement favors approval. *Troncelliti v. Minolta Corp.*, 666 F. Supp. 750, 754–55 (D. Md. 1987). The Fourth Circuit has held that a class action settlement was reasonable where, as here, the opt-out rate was

13

less than two percent. *See Flinn v. FMC Corp.*, 528 F.2d 1169, 1174 (4th Cir. 1975) (finding class action settlement reasonable where, out of 253 class members, only five "filed any dissent"). Turning to the single objection filed, Mr. Gauzza initially sent an objection on March 5, 2025 to Plaintiff's counsel disputing the calculation of the number of days he was incarcerated. Livengood ¶ 19. As required by the Settlement Agreement, Plaintiff's counsel immediately sent the letter to SSI and defense counsel, and defense counsel responded the following week confirming that the initial calculations were correct. On March 12, 2025, SSI sent a challenge denial letter approved by the Parties to Mr. Gauzza. After sending that letter, SSI received another letter from Mr. Gauzza containing a new address in the Loudoun County Adult Detention Center, so on March 18, 2025, SSI sent another copy of the challenge denial letter to Mr. Gauzza there. On April 4, 2025, Plaintiff's counsel visited Mr. Gauzza in person at the Loudoun County Adult Detention Center to hand-deliver a copy of the denial letter and another copy of the notice.

After learning that the Parties believed his day count was correct, Mr. Gauzza filed an objection in which he objects to the amount of the settlement, asserting that VDOC should compensate class members more than $118 per day of over-detention. *See* Dkt. 59 at 1 ("I feel $118 a day just isn't enough."). While Plaintiff acknowledges that no amount of money can fully compensate class members for time lost in prison, the settlement amount is typical for over-detention cases, as explained in Section I.C.1 below. And Mr. Puryear, the Named Plaintiff, continues to support the proposed settlement. *See* Decl. of L. Puryear (Ex. 3) ¶¶ 15, 18.

## C. Reasonableness

As noted above, there is no specific test used to assess reasonableness in the Fourth Circuit, but several relevant factors favor approval of the proposed settlement.

14

### 1.  **The Size of the Recovery is Reasonable**

The settlement achieves an excellent result for the class, especially in light of the legal and factual obstacles that Plaintiff would otherwise need to overcome and the costs of proceeding through trial and appeal. *See supra* sec. I.B.1–2. The settlement reached here will compensate the 52 class members $118 per day, or $43,070 per year, of over-detention. *See* Settlement Agmt. ¶ 4.a.i. The absolute amount of the payments will be substantial; no class member will receive less than $1,000, *id.*, approximately three-fourths of the class will receive more than $10,000, *id.* at Ex. A, and the average award is $21,731.12. These class members will not have to obtain and pay counsel, file their own cases, respond to discovery requests, or otherwise bear the burdens of litigation in order to obtain these substantial settlement payments.

Compensation of $43,070 per year of over-incarceration is reasonable under the present circumstances. Virginia law provides that persons who are wrongly incarcerated due to a conviction that is later overturned are entitled to $55,000 per year of over-incarceration, plus attorney's fees. *See* Va. Code Ann. § 8.01-195.11(A)(1), (C). Defendants took the position during negotiations that the $55,000 statutory amount is higher than what class members are entitled to because it is the amount set for people who should not have been incarcerated in the first place. While Plaintiff disputes this argument, a jury or Court might find it persuasive. This settlement nevertheless provides over 50 formerly incarcerated individuals with a recovery that is approximately 80% of that statutory number, without each person having to show that their incarceration itself was unlawful, as they would have to under the statute, or litigate their constitutional claims and engage with thorny legal issues such as qualified immunity.

The recoveries in analogous cases confirm the reasonableness of the settlement amount. For example, in November 2020, a District Court approved a settlement that compensated a class

of individuals who were over-detained by the Los Angeles Sheriff's Department up to $25,000 per person, at a rate of $1,000 per day. *See* Preliminary Approval Order, *Roy v. Los Angeles*, No. 2:12-cv-09012 (C.D. Cal. Nov. 25, 2020), Dkt. 610. Those class members remained in jail "after they were acquitted or otherwise ordered released by a judge, or after serving a jail sentence," *id.* at 1. That class members had been acquitted and were nevertheless held in jail may have justified the higher per-day amount than here, and even so, the $25,000 per-person cap is substantially lower than what many class members here will receive, *see* Settlement Agmt., Ex. A. Similarly, a federal court in the District of Columbia approved a settlement that compensated a class of individuals who had been over-detained and/or strip-searched at the D.C. Jail, providing $370 for the first day of over-detention, and $250 per day thereafter. *See* Class Action Settlement Agmt., *Barnes v. District of Columbia*, No. 1:06-cv-00315 (D.D.C. Nov. 4, 2013), Dkt. 465-2. This is $91,370 per year of over-detention, but because the *Barnes* class members were over-incarcerated for days or weeks—rather than the months or years alleged here—most payments to the *Barnes* class members would be lower than those agreed to here. As such, the recovery here is well within the bounds of reasonableness.

## II.    A SETTLEMENT CLASS SHOULD BE CERTIFIED UNDER RULES 23(a) AND 23(b)(3).

The Settlement Agreement provides that the settlement will be effectuated through class action treatment, and the Parties will support certification for this purpose. *See* Settlement Agmt. ¶¶ 2–3. For a class to be certified, it must meet the requirements of Fed. R. Civ. P. 23. *Jonathan R. v. Just.*, 344 F.R.D. 294, 302 (S.D. W. Va. 2023). This requires that Plaintiff satisfy each of the four criteria provided in Rule 23(a)(1)–(4) and one of three subcategories of Rule 23(b). *Id.* Courts "'give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the

affected parties and . . . promote judicial efficiency.'" *Scott v. Clarke*, 61 F. Supp. 3d 569 (W.D. Va. 2014) ((quoting *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003)).

In addition to these explicit requirements of Rule 23, the Fourth Circuit has read in an "implicit threshold requirement that the members of a proposed class be readily identifiable." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (citation omitted). This requirement, also known as "ascertainability," is clearly met here, where the Parties have compiled a list of all potential class members. *See* Settlement Agmt., Ex. A.

### A.    Rule 23(a) is Satisfied.

#### 1.    Rule 23(a)(1) – Numerosity

The Parties' exchange of information during settlement negotiations confirmed that the proposed class is composed of 52 individuals. *See* Settlement Agmt., Ex. A. This easily satisfies Rule 23(a)(1), requiring that "the class is so numerous that joinder of all members is impracticable." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 233–34 (4th Cir. 2021) (finding that a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone).

#### 2.    Rule 23(a)(2) – Commonality

To satisfy commonality, "a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Commonality is present when the claims of class members "depend upon a common contention . . . . [that is] capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. "This does *not* mean, of course, that the entire *case* must be decided by a single issue." *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 200 (E.D. Va. 2015). Moreover, the Fourth Circuit has recognized that "a class action will not be

defeated solely because of some factual variances in individual grievances" when there are common questions of law. *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 58 (E.D. Va. 2021), *aff'd sub nom. Williams v. Martorello*, 59 F.4th 68 (4th Cir. 2023) (internal quotation marks and citation omitted).

Here, several common factual and legal questions are central to resolving this dispute and capable of class-wide resolution, satisfying Rule 23(a)(2). These include how Defendants determined which categories of offenses were excluded from expanded ESCs under Va. Code Ann. § 53.1-202.3(A); what Defendants' policy was regarding ESC eligibility for people convicted of inchoate offenses related to robbery and carjacking; what roles VDOC officials played in making, promulgating, and enforcing VDOC policy around ESCs; and whether Defendants' policy and practice of denying ESCs (and thus release) for inchoate versions of robbery or carjacking violated the substantive or procedural due process protections of the Fourteenth Amendment, the Eighth Amendment's prohibition against cruel and unusual punishment, and/or the right to be free from false imprisonment under Virginia law. Cases like this, where Plaintiff's allegations are based on VDOC's "standardized conduct," are especially appropriate for class treatment. *Big Picture Loans*, LLC, 339 F.R.D. at 61. Standardized conduct allows key questions—*e.g.*, how did VDOC determine who was eligible for expanded ESCs—to be answered "in one stroke," *Dukes*, 564 U.S. at 350, for the whole class.

### 3. **Rule 23(a)(3) – Typicality**

"The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Big Picture Loans, LLC*, 339 F.R.D. at 58 (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006)). Typicality does not mandate that the class representative's claims are identical to those of the class; instead, the

representative "must generally be part of the class and have 'the same interest and suffer the same injury as the class members.'" *Id. See also Brown*, 318 F.R.D. at 567.

Mr. Puryear's claims are typical of the Class. Mr. Puryear was incarcerated by Defendants for inchoate offenses related to robbery; engaged in good conduct and program participation; and was subject to prolonged and illegal detention pursuant to Defendants' uniform policy of excluding persons serving sentences for inchoate offenses related to robbery and/or carjacking from the expanded ESC program. *See* Dkt. 47-4 (Puryear Prelim. Appr. Decl.) ¶¶ 2–8. This is precisely what is alleged as to the Class, Dkt. 1 (Complaint) ¶¶ 12–20, and satisfies the typicality requirement.

### 4.  Rule 23(a)(4) – Adequacy of Representation

"The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." *Sharp Farms v. Speaks*, 917 F.3d 276, 295 (4th Cir. 2019) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). "For a conflict of interest to defeat the adequacy requirement, 'that conflict must be fundamental.'" *Id.* (quoting *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010)); *see also Nelson v. Warner*, 336 F.R.D. 118, 124 (S.D. W. Va. 2020) (noting that "[o]nly conflicts that . . . go to the heart of the litigation prevent a plaintiff from meeting . . . the adequacy requirement").

No conflict, let alone a substantial one, exists between Mr. Puryear and other members of the proposed class. In fact, all share an interest in being compensated for the damages caused by over-detention due to VDOC's uniform policy of denying expanded ESCs to individuals convicted of inchoate offenses related to robbery and/or carjacking.

Class counsel's competence and experience is also a factor in determining adequacy of representation. *Thomas v. FTS USA, LLC*, 312 F.R.D. 407, 419–20 (E.D. Va. 2016). As

19

described above, undersigned counsel has experience in both constitutional and class action litigation. *See supra* sec. I.A.4. By their litigation of this case, *see, e.g.*, Dkt. 20, counsel has demonstrated that it is able and firmly committed to zealously pursuing the class members' interests.

### B.  Rule 23(b)(3) is Satisfied.

Classes seeking monetary relief are subject to the certification requirements of Rule 23(b)(3). *Dukes*, 564 U.S. at 362. The class here satisfies Rule 23(b)(3)'s two relevant criteria: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**Predominance.** – The common questions detailed above, *see supra* sec. II.A.2, are the predominant issues pertaining to liability, and the resolution of those questions will serve as the basis for liability determinations as to each of the causes of action at issue. Those common questions predominate over the only potentially individualized issue: damages. "Courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations." *Reed v. Alecto Healthcare Servs., LLC*, 2022 WL 4115858, at *7 (N.D. W. Va. July 27, 2022). This is particularly so here, where the Parties have agreed that individual damages will be determined formulaically according to a per-day amount, a method courts have found appropriate in similar cases. *See Langley v. Coughlin*, 715 F. Supp. 522, 558 (S.D.N.Y. 1989) ("[C]ourts have been perfectly willing, . . . to award *per diem* damages to an inmate unconstitutionally confined.").

**Superiority.** – Rules 23 identifies four (non-exhaustive) factors that are pertinent to this inquiry:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of a litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

*Id.* Subsection (D) is not relevant to a settlement-only class. *Brown*, 318 F.R.D. at 569 ("With settlement classes, . . . courts need not consider the last factor, 'whether the case, if tried, would present intractable management problems, for the proposal that there will be no trial.'") (quoting *Amchem Prod.*, 521 U.S. at 593).

The relevant factors all support certification here. The "dominant[]" purpose of factor (A) is to provide for the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Bicking v. Mitchell Rubenstein & Assocs., P.C.*, No. 3:11CV78, 2011 WL 5325674, at *4 (E.D. Va. Nov. 3, 2011) (quoting *Amchem Prod.*, U.S. at 617); *see also In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D 162 (D.S.C. 2018) (finding that "the vast majority of class members have a de minimis interest in individually controlling the prosecution of their . . . claims because the monetary value of their damages would be dramatically outweighed by the cost of litigation an individual case"). The lack of economic resources and incentives for individual class members to bring their own suits are key considerations, *see Pitt v. City of Portsmouth*, 221 F.R.D. 438, 445–46 (E.D. Va. 2004), both of which are present in this case. People who are incarcerated—as the

class members necessarily have been—are disproportionately poor[3] and face significant hurdles in obtaining counsel and bringing private litigation.  Many of the same challenging factual and legal issues identified above, *see supra* sec. I.B.1, would be present in individual, non-class litigation. As described above, a fair individual recovery in this case could be in the tens of thousands of dollars, which would not justify the substantial cost required to demonstrate Defendants' liability for damages. Given the costliness of individual litigation, this factor supports class certification.

As to the factor in subsection (B), Mr. Puryear is unaware of any other litigation concerning the controversy detailed in the complaint. The factor in subsection (C) has been addressed and satisfied because Defendants reside in this District and the events giving rise to the claims occurred within this District. Defs. Answer, Dkt. 19, ¶¶ 21–22.

### C.  Plaintiff's Counsel Satisfy Rule 23(g) Requirements

Rule 23(g) requires the Court to appoint class counsel when it certifies a class. Plaintiff's counsel has carefully investigated the potential class claims in this action; has substantial experience in class action litigation, including complex civil rights matters; is knowledgeable about the law relevant to this action; and has committed significant resources to representing the class. *See supra* sec. I.A.4. Accordingly, class counsel fairly and adequately represents the interest of the class. *See* Fed. R. Civ. P. 23(g)(1) & (4).

### III.     ADEQUATE NOTICE HAS BEEN DISSEMINATED TO THE CLASS.

Prior to finally approving the proposed settlement, the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P.

---

[3] *See* Bernadette Rabuy & Daniel Kopf, *Prisons of Poverty: Uncovering the pre-incarceration incomes of the imprisoned*, PRISON POLICY INITIATIVE (July 9, 2015), https://www.prisonpolicy.org/reports/income.html.

23(e)(1). Because Plaintiff requests certification under Rule 23(b)(3), the notice must be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Similarly, due process requires reasonable notice and the opportunity to be heard or withdraw from the class. *See McAdams v. Robinson*, 26 F.4th 149, 157–58 (4th Cir. 2022).

Notice in accordance with these standards was accomplished pursuant to the procedures set forth in the Settlement Agreement and Preliminary Approval Order. *See* Lange Decl. ¶¶ 2; 13; Livengood Decl. ¶¶ 15, 22. Defendants provided to SSI a spreadsheet containing mailing addresses and phone numbers for 51 of the 52 remaining class members.[4] Lange Decl. ¶ 3. The one class member without an address, Jorge Jovel, was deported from the United States shortly after he was released from VDOC custody. Settlement Agmt. ¶ 1.o.3. Plaintiff's counsel undertook extensive efforts to locate and contact Mr. Jovel and was ultimately successful in doing so. Plaintiff's counsel has arranged with SSI for Mr. Jovel to receive his settlement payment through wire transfer, Livengood Decl. ¶ 18.

SSI mailed notices to each of the 51 class members for whom Defendants provided addresses. Lange Decl. ¶ 6. Six of them have since been re-incarcerated (one in VDOC and five in county jails); Plaintiff's counsel called each correctional facility to obtain the legal mail address, and SSI mailed notices to those custodial addresses. Livengood Decl. ¶ 19. For people incarcerated at jails, SSI also sent duplicate notices to their last known residential addresses, Lange Decl. ¶ 8. Two of these duplicate notices sent to residences were returned as undeliverable, but those class members appear to have received notice through the mailings sent

---

[4] As described above, while the Parties originally identified 53 potential class members, one member, Mr. Ellington, executed a separate agreement with Defendants prior to the motion for preliminary approval, releasing his claims against Defendants.

to their custodial addresses. SSI and the Parties learned that two other incarcerated class members had not received notice at the prison and jail where they were incarcerated—in one instance, the prison said the mail needed to be re-sent as Legal Mail; in the other, a class member learned through his fiancée about the Notice and wrote to say he had not received it. Both class members received an additional copy of the Notice, one by mail and in-hand, and the other through in-hand delivery by Plaintiff's counsel. *See* Lange Decl. ¶ 9; Livengood Decl. ¶¶ 19–20.

As for non-incarcerated class members, seven of the mailed notices were returned undeliverable; SSI conducted tracing and identified alternate addresses for six people. Lange Decl. ¶ 8. Notices were mailed to those new addresses and were not returned. *Id*. As for the individual whose notice was returned and for whom SSI could not identify a new address, he was contacted in three ways, most importantly, through in-hand service by Plaintiff's counsel. Livengood Decl. ¶ 21. Plaintiff's counsel initially found an additional address for him, and SSI sent him a Notice there. *Id*. ¶ 21; Lange Decl. ¶ 8. Shortly after, Plaintiff's counsel learned from his probation officer that he was at a residential facility in Washington, D.C., and Plaintiff's counsel visited him in person there to deliver a copy of the Notice. Livengood Decl. ¶ 21. Separately, SSI conducted tracing using social security numbers and identified an email address for him; SSI emailed him the notice there, and it did not bounce back. Lange Decl. ¶¶ 7–8. SSI also found email addresses for 16 class members, 14 of whose physical notices had not been returned, and emailed them to increase the likelihood of notice; five of those were returned as undeliverable. Lange Decl. ¶ 7–8. SSI also emailed all probation officers for whom it had contact information, covering 36 class members, and one was returned as undeliverable. *Id*.

The rate at which attempts to provide notice were bounced, returned, or otherwise unsuccessful was favorable relative to other cases. *See* Lange Decl. ¶ 13. First-class mailing in

conjunction with tracing satisfies Rule 23 and due process where, as here, the Parties have addresses, social security numbers, and phone numbers of the class members. *See Thorpe v. Va. Dep't of Corr.*, No. 2:20-cv-00007, 2023 WL 5038692, at *5 (W.D. Va. Aug. 8, 2023); *Minter v. Wells Fargo Bank, N.A.*, 283 F.R.D. 268, 275 (D. Md. 2012). Emails to class members and their probation officers made the notice process even more effective than necessary to satisfy due process and Rule 23. The notice was provided to class members with adequate time for them to decide if they wanted to object or opt out. *See* Preliminary Approval Order ¶¶ 14, 17; Settlement Agmt. ¶¶ 14–15 (opt-outs due 47 days after deadline for mailing of notice; objections due 54 days after deadline for mailing of notice).

As the Court already determined in addressing the notice in the Preliminary Approval Order, Dkt. 56 ¶ 5, the content of the proposed notice was also sufficient. As required under Rule 23(c)(2)(B) and Rule 23(e)(5), it described the case and terms of settlement, provided the class definition, told class members that they may appear through an attorney, told them that they may be excluded from the class or object to the settlement and how to do so, and explained the binding effect of a class judgment on class members. The notice also described the claims process that will be utilized if the settlement receives final approval. The notice satisfied the requirements of due process and Rule 23.

On May 1 and May 5, 2025, Defendants sent the required notice of the proposed settlement pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, to the requisite officials. Decl. of M. O'Shea dated May 5, 2025 (Ex. 4).

## IV.    THE ATTORNEYS' FEES AND COSTS ARE REASONABLE.

As this Court has recognized, the two methods for assessing the reasonableness of attorneys' fees are the "percentage of the fund" method and the lodestar method, *Skochin v.*

*Genworth Fin., Inc.*, No. 3:19-cv-49, 2020 WL 6536140, at *3 (E.D. Va. Nov. 5, 2020). While "[t]he Fourth Circuit has not explicitly mandated which method district courts should use . . . the favored method for calculating attorneys' fees in common fund cases is the percentage of the fund method." *Id.* at *3–4. Regardless of which method is used in the first instance, courts typically apply "one method as the primary calculation and use the other method as a cross check on the reasonableness of the first." *Id.* at *4. *See also, e.g.*, *Galloway*, 2020 WL 7482191. Where, as here, the settlement is structured with one fund for class members and a separate fund for attorneys' fees, this Court has used the "constructive common fund" method, assessing fees as a percentage of the overall settlement, including both the common fund and attorney fee fund. *Skochin*, 2020 WL 6536140, at *6–7.

"Once a figure has been calculated using the percentage of the fund or lodestar method, a court must determine if that result is reasonable." *Id.* at *4. Courts in the Fourth Circuit have applied both the 12-factor test from *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974) and the 7-factor test from *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000). *See Skochin*, 2020 WL 6536140, at *6.

The *Johnson* test includes the following factors:

(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for legal work; (6) the attorney's expectations at the outset of litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation[,] and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

26

*Skochin*, 2020 WL 6536140, at \*4–5 (quoting *Brown*, 318 F.R.D. at 577; *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978)). The *Gunter* factors, which overlap with the *Johnson* factors, are:

> (1) the results obtained for the class; (2) the quality, skill, and efficiency of the attorneys involved; (3) the complexity and duration of the case; (4) the risk of nonpayment; (5) awards in similar case; (6) objections; and (7) the amount of time devoted to the case by plaintiffs' counsel.

*Id.* at \*5. As this Court has explained, "the Court need not address all twelve *Johnson* factors independently because many of these considerations are subsumed in the calculation of the hours reasonably expended and the reasonableness of the hourly rate." *Skochin*, 2020 WL 6536140, at \*5 (citing *Brown*, 328 F.R.D. at 577).

In its reasonableness analysis, the Court may also consider that the fee was negotiated, rather than litigated, and that the settlement provides separately for attorneys' fees, such that fees will not diminish the recovery available to the class. *See Skochin*, 2020 WL 6536140, at \*6, \*8.

### A.  Fee as a Percentage of the Fund

The fee is a reasonable percent of the constructive common fund. Plaintiff's counsel seeks an award of $400,000, or about 25% of the $1,590,018 common fund. As this Court has noted, this amount is well within the range courts have approved in the Fourth Circuit. *See Skochin*, 2020 WL 6536140, at \*7 ("A percentage fee of 28.5% is not outside the realm of reasonable percentage fee awards . . . ."); *Galloway*, 2020 WL 7482191, at \*9 (approving award of 33% of settlement fund); *Mills*, 265 F.R.D. at 264 ("[P]ercentage awards are often between 25% and 30% of the fund.") (quotation marks omitted). Moreover, because it is a separate fund, the fee award will not diminish any payment to the class—any amount not awarded to Plaintiff's counsel will simply be retained by Defendants.

27

### B.  Lodestar Cross-Check

The lodestar cross-check confirms the reasonableness of the rates. Currently, counsel's lodestar is $569,095. This does not include time spent preparing the final approval motion or time that counsel will spend effectuating the settlement if it is approved. As demonstrated by Plaintiff's counsel's significant efforts to reach class members during the notice period, it is reasonable to assume Plaintiff's counsel will incur substantial additional expenses during the distribution period. With an award of $400,000, this is a multiplier of 0.7. Courts in the Fourth Circuit have approved fee awards with multipliers well above this; as the court in *Binotti v. Duke University*, No. 1:20-cv-470, 2021 WL 5366877, *4 (M.D.N.C. Aug. 30, 2021), recognized, "lodestar multipliers ranging from 2 to 4.5 demonstrate the reasonableness of the requested percentage fee." *See also Galloway*, 2020 WL 7482191, at *12 (approving award where lodestar multiplier was .65 and recognizing that "[a] multiplier of 0.65 is, unsurprisingly, below average both nationally and in this Circuit.")); *Skochin*, 2020 WL 6536140, at *10 (collecting cases).

The lodestar number here is reasonable in terms of both rates and hours worked. The rates sought by counsel are reasonable in light of local rates in Richmond; the firm's market rates; and the degree of expertise and skill counsel brings.

As this Court explained in *Skochin*, the reasonableness of rates is judged primarily by reference to local rates where the case is filed. *See Skochin*, 2020 WL 6536140, at *4. By that measure, Relman Colfax's rates are reasonable: they are within the range that this Court approved more than two years ago in *Haney v. Genworth Life Ins. Co.*, 3:22-cv-55-REP, Dkt. 137 (opinion); Dkt. 43-9 (rates), as shown in the table below:

28

| Title | Relman Colfax Rate | Approved Rate for Class Counsel in *Haney v. Genworth* in 2023 |
|---|---|---|
| Partner | $975 | $500-1100 |
| Attorney | $600 | $350-630 |
| Fellow | $500 | $350-630 |
| Paralegal | $300 | $100-375 |

As this Court has explained, in addition to local rates where the case is filed, "an attorney's actual billing rate can also be considered." *Skochin*, 2020 WL 6536140, at *4. Relman Colfax's actual billing rates are also reasonable.[5] Peer firms have attested to the reasonableness of Relman Colfax's rates. *See Gilead Community Svcs., Inc. v. Town of Cromwell*, 432 F. Supp. 3d 46 (D. Conn. 2019), No. 3:17-cv-627, Dkt. 301, 301-6, 301-7, 301-10, 301-12. And last year, Judge Rubin in the District of Maryland said that Relman Colfax's "hourly rates are well within the goalpost of litigators in their general field of their echelon" and "comfortably within the ranges of rates approved as reasonable in recent class actions in this circuit," Dkt. 47-5 at 25.

The time counsel has spent, 903.8 hours, amounting to $569,095, is also reasonable:

| Case Phase | Attorneys' Fees | Hours |
|---|---|---|
| Investigation and Complaint Drafting | $84,010.00 | 134.3 |
| Motion to Dismiss | $65,090.00 | 82.70 |
| Discovery | $114,852.50 | 187.40 |
| Mediation and Negotiating Settlement Agreement | $111,347.50 | 178.9 |
| Motion for Preliminary Approval and Class Certification Motion and Hearing | $142,575.00 | 223.80 |
| Ensuring Notice to Class | $40,297.50 | 77.90 |
| Admin | $4,975.00 | 12.20 |
| Media | $5,947.50 | 6.60 |
| **Total** | **$569,095** | **903.80** |

---

[5] Michael Allen's billing rate in 2023 was $1,100 per hour, and in 2025 is $1,250 per hour; that rate has been reduced to $975 per hour.

In arriving at this lodestar number, counsel exercised billing discretion and cut $104,045 by removing time entries by non-core timekeepers, time spent bringing new attorneys or staff onto the case, hours spent by attorneys or paralegals attending hearings where they were not engaged in a stand-up role, time spent by attorneys on administrative work, and billing entries that were overly vague.

The entries that were not cut reflect an efficient and reasonable use of time. While many of these categories are self-explanatory, counsel explains further below the nature of the time spent on discovery and ensuring notice to the class.

**Discovery.** Because discovery and settlement discussions proceeded concurrently, the Parties exchanged initial disclosures, and Plaintiff's counsel propounded two sets of interrogatories, one set of requests for production of documents (RFPs) to each defendant, received and responded to 17 interrogatories and 21 RFPs, and reviewed over 8,000 documents, including a production of 250 of Defendants' internal documents and a production of 7,616 emails Mr. Puryear sent and received while incarcerated. Expert reports were also to be due early in the discovery period, so Plaintiff's counsel spent time identifying and interviewing several potential experts on the damages stemming from over-detention.

**Ensuring Notice to Class.** Relman Colfax has also incurred significant costs to support a settlement framework in which money is not diverted from the class fund to settlement administration. While class action settlement agreements may allow counsel to seek excess claims administration costs from the common fund, here, Relman Colfax has agreed to provide administrative support to ensure that the settlement can be administered for no more than $20,000 paid to the settlement administrator, with no money coming from the fund available to class members. As reflected above, Relman Colfax has so far spent approximately $40,000 of

30

attorney and staff time ensuring that class members learn of the settlement agreement and are aware of the steps they may take to preserve their rights in relation to that agreement. In addition to regular communication with the settlement administrator, Plaintiff's counsel has ensured effective notice through multiple in-person visits, including with the class member who objected, and Plaintiff's counsel undertook an extensive and ultimately successful effort to locate a class member who was deported to Guatemala before the settlement was reached to ensure he could receive an award. *See* Livengood Decl. ¶¶ 18, 20–21.

If the settlement is approved, Plaintiff's counsel will continue to expend considerable time ensuring that each class member receives settlement funds.

### C. Degree of Success Obtained (*Gunter* and *Johnson*)

"[T]he most critical factor in determining the reasonableness of a fee award," and the first factor identified in *Gunter*, "is the degree of success obtained." *Doe v. Chao*, 435 F.3d 492, 506 (4th Cir. 2006) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)); *see also Gunter*, 223 F.3d at 191, 193; *Johnson*, 488 F.2d at 718. Plaintiff's counsel has achieved an extremely successful result here, especially given the difficulty of litigating constitutional damages claims against the government and the vigorous defense mounted by the Office of the Attorney General. The suit has resulted in over $43,000 per year of incarceration *per class member*, providing relief to each of the more than 50 people who were detained longer than they should have been because of the ESC policy Plaintiff challenges. The absolute amount of the payments will be substantial; no class member will receive less than $1,000, and approximately three-fourths of the class will receive more than $10,000. The average recovery is $21,731.12, a significant amount of money at a time when people have recently left prison and are often in a financially precarious position.

$43,000 per year is close to the amount Virginia provides by statute for people who prove they never should have been incarcerated in the first place, $55,000 per year. *See* Va. Code Ann. § 8.01-195.11(A)(1), (C). As described in section I.C.1, *supra*, this award is comparable to awards in similar cases.

The settlement result also meaningfully advances the interests of the class because it provides them with damages in a timely way; Defendants' chief argument was that their conduct was protected by qualified immunity; even if Plaintiff had succeeded at every stage in rebutting that argument, further litigation of the qualified immunity issue would almost certainly involve years of costly interlocutory appeals.

### D.  The nature and length of the professional relationship between attorney and client (*Johnson*)

This is the rare case where Plaintiff's counsel has worked on behalf of Named Plaintiff Leslie Puryear and the class since before this case was contemplated. In the summer of 2023, Plaintiff's counsel represented Mr. Puryear *pro bono* in investigating and filing a *habeas* petition challenging the application of the ESC policy to Mr. Puryear, and, by logical extension, everyone serving a sentence for an inchoate offense related to a robbery or carjacking violation. Plaintiff's counsel filed a *habeas* petition on behalf of Mr. Puryear on September 26, 2023, and in November 2023, VDOC changed its application of the ESC statute to the class here, people serving sentences for inchoate offenses related to robbery or carjacking. As a result of this change, Defendants released Mr. Puryear and dozens of other class members. In this way, Plaintiff's counsel secured a significant benefit—accelerated release from prison—for Mr. Puryear and all members of the class before this case began. Plaintiff's counsel's role in the *habeas* case also benefited the class in the instant case. Plaintiff's counsel became familiar with the ESC issue through that representation, so that the investigation phase of the civil case was

32

much shorter than it otherwise might have been. Since then, Plaintiff's counsel has worked

closely with Plaintiff to bring this case, as described further below.

### E. The presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel (*Gunter*)

Only one class member, Jedidiah Gauzza, has filed an objection. *See* J. Gauzza

Objection, Dkt. 59.[6] The gravamen of Mr. Gauzza's objection is that VDOC should compensate

class members more than $118 per day of over-detention. *See* Dkt. 59 at 1 ("I feel $118 a day

just isn't enough."). Mr. Gauzza also notes that "DOC and the *lawyers* are coming out better than

we are and we're the ones who w[ere] violated." Dkt. 59 at 3 (emphasis in original). Mr. Gauzza

does not say what he thinks an adequate remedy or an appropriate attorney fee award would be.

Plaintiff's counsel acknowledges that no amount of money can fully compensate for the time lost

in prison, but as explained in section I.C.1, *supra*, the settlement amount represents a recovery

typical in over-detention cases, and an enormous and timely success in light of the challenging

and certainly protracted qualified immunity dispute that the Parties would otherwise have to

engage in. And Mr. Puryear, the Named Plaintiff, continues to support the proposed settlement.

*See* Puryear Decl. ¶ 15, 18.

### F. The skill and efficiency of the attorneys involved (*Gunter*). The requisite skill required and the experience, reputation, and ability of the attorneys (*Johnson*).

Relman Colfax is a civil rights law firm based in Washington, D.C., with a national

practice. Relman Colfax routinely litigates a wide range of civil rights cases in federal court,

including many cases, like this one, that involve constitutional claims against government actors,

---

[6] With respect to the settlement overall, this "almost complete absence of opposition to the settlement" agreement favors approval. *Troncelliti*, 666 F. Supp. at 754–55. *See also Flinn*, 528 F.2d at 1174 (finding class action settlement reasonable where, out of 253 class members, only five "filed any dissent").

Livengood Decl. ¶ 6, and serves as class counsel for certified class actions, *id.* ¶ 5. Courts have repeatedly found Relman Colfax qualified to serve as class counsel, *see, e.g.*, *Moore v. Napolitano*, 926 F. Supp. 2d. 8, 35 (D.D.C. 2013) ("There is no dispute as to whether the plaintiffs' class counsel are appropriate, and there is no indication that class counsel lack the experience and knowledge required to represent the class."), and in a recent class action in the Fourth Circuit, Judge Rubin in the District of Maryland recognized Relman Colfax as having "considerable expertise and depth of experience in complex civil rights litigation," and Judge Rubin relied on that experience in upholding the fee award there. Dkt. 47-5 at 19:15-18.

### G. The complexity and duration of the litigation and the amount of time devoted to the case by Class Counsel (*Gunter*). The time and labor expended, the novelty and difficulty of the questions, and the requisite skill required (*Johnson*).

The time and labor Plaintiff's counsel expended on the case is addressed above. With respect to the novelty and difficulty of the legal questions and the requisite skill required, the legal issues at stake here involve complex questions of qualified immunity and deliberate indifference. At the time Plaintiff's counsel filed the complaint, the only other lawsuit involving the application of this ESC statute had been dismissed on a motion to dismiss. *See Swart v. Miyares*, No. 3:23-cv-753, 2024 WL 466797 (E.D. Va. Jan. 31, 2024). Plaintiff's counsel spent considerable time distinguishing that case and this one—distinctions that are significant, and, in Plaintiff's view, would ultimately have been dispositive—but the outcome in *Swart* nevertheless required ample attorney time to ensure that this case was viable. In addressing the distinctions between *Swart* and this case, Plaintiff's counsel brought to bear its significant experience with issues of qualified immunity, having successfully litigated this issue many times. *See, e.g.*, *Goodwin v. Dist. of Columbia*, No. 21-806, 2025 WL 637467 (D.D.C. Feb. 27, 2025) (Relman Colfax case in which court denied qualified immunity to officer in use of force case); *Hicks v.*

*Ferreyra*, 396 F. Supp. 3d 564 (D. Md. 2019) (Relman Colfax case in which court denied

qualified immunity to Park Police officers who had stopped and detained Secret Service agent),

*aff'd* 965 F.3d 302 (4th Cir. 2020); *Gilead Community Svcs., Inc. v. Town of Cromwell*, 432 F.

Supp. 3d 46 (D. Conn. 2019) (Relman Colfax case in which court denied qualified immunity to

town officials alleged to have retaliated against group home for people with disabilities).

 **H.  The risk of nonpayment (*Gunter*). Whether the fee is fixed or contingent (*Johnson*).**

  Plaintiff's counsel took this case on a contingency basis, with no guarantee of payment.

The case could have gone on for years and through several rounds of interlocutory appellate

review, all with the possibility of losing on qualified immunity, particularly in light of *Swart*.

 **I.  Awards in similar cases (*Gunter* and *Johnson*).**

  As described above, in the Fourth Circuit, an attorney fee award of 25% in a class action

is reasonable. This award is also typical for over-detention cases specifically. In those cases,

courts have awarded either (1) fee awards with positive-multipliers relative to lodestars or (2) a

higher percentage of the common fund in attorneys' fees. For example, in *Camarlinghi v. Santa

Clara Cnty.*, No. 5:21-CV-03020, 2022 WL 17740464 (N.D. Cal. Dec. 16, 2022), the plaintiff's

counsel represented a proposed class of about 240 people whom the plaintiff alleged were held in

jail improperly after the district attorney had decided not to prosecute them. *Id.* at *1–2. At

settlement, the court awarded the plaintiff's counsel $325,000 in attorneys' fees, a 1.05

multiplier of their $308,229.50 lodestar (amounting to 13.6–15.8% of the total settlement

amount). In *Driver v. Marion Cnty. Sheriff*, No. 14-cv-02076 (S.D. Ind. Aug. 8, 2022), Dkt. 539,

the plaintiff's counsel represented a class of people who had been over-detained during more

than 15,000 jail stays after release orders had been entered. *Id.* at 5. The plaintiff's counsel's

lodestar was $4,440,945, Dkt. 523, and the court ordered an attorneys' fee award of $4,000,000,

which amounted to about 36% of the total settlement amount, *see* Dkt. 539 at 6 (noting that

Defendants' total exposure for settlement payments to class members was $7,032,560)

## V.    THE SERVICE AWARD SOUGHT IS REASONABLE AND SHOULD BE AWARDED.

Fed. R. Civ. P. 23(e)(2)(D) authorizes the payment of service awards to named plaintiffs

to ensure that the settlement "treats class members equitably relative to each other." As the

Fourth Circuit explained in *Berry v. Schulman*, 807 F.3d 600, 613 (4th Cir. 2015), it is common

for courts to compensate class representatives "for work done on behalf of the class, to make up

for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize

their willingness to act as a private attorney general." *See also Burke v. Shapiro, Brown & Alt,*

*LLP*, No. 3:14CV201, 2016 WL 2894914, at *6 (E.D. Va. May 17, 2016) (quoting *Cook v.*

*Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) and identifying similar factors). All these factors

favor the service award here.

### A.  Work Done on Behalf of the Class and Willingness to Act as a Private Attorney General

As described above, Mr. Puryear's work on behalf of the class began before the instant

action. When Mr. Puryear was incarcerated, he worked assiduously to find counsel to represent

him in a *habeas* petition. His email records show that he exchanged approximately 112 emails in

an effort to identify and secure representation. Livengood Decl. ¶ 14. Because of his impeccable

disciplinary record, *see* Dkt. 1 ¶¶ 53–54, Mr. Puryear was particularly well-suited to bring this

*habeas* petition. His efforts were successful; Mr. Puryear ultimately secured Relman Colfax and

the American Civil Liberties Union of Virginia as counsel, and his *habeas* petition led to his

release and the release of dozens of others who had been serving sentences for inchoate offenses

related to robbery and carjacking. Indeed, VDOC recognized Mr. Puryear's pivotal role,

referring to the people who had been released as "the Puryear releases." Dkt. 47-2 ¶ 9.

After securing the release of the class, Mr. Puryear worked with Relman Colfax to bring a civil suit. Rather than bring a suit on his behalf alone, which would have avoided the complexities and risks of a class action, Mr. Puryear pursued a class action. Critically, Mr. Puryear was the *only* person who came forward to file this suit. Although the case received ample publicity and Plaintiff's counsel was available to speak to people who thought they might be class members, no other person who was in fact a part of the class came forward at any time prior to the notice period. Livengood Decl. ¶ 7. This is understandable in light of the more urgent concerns facing people returning home from prison, but it makes Mr. Puryear's contributions all the more meaningful. By virtue of his discipline and family support, Mr. Puryear was unusually situated for an extremely stable return when he left prison, coming home to a family, home, and job. Puryear Decl. ¶ 9. He used that stability to seek redress for himself and a class of people who were not able to sue on their own behalf. Unlike a class with multiple named plaintiffs, here, Mr. Puryear is the but-for cause of the class-wide relief.

Mr. Puryear has been an active partner in pursuing this action. Counsel's time records show that Mr. Puryear has spent about 30 hours working with counsel on the case—meeting with counsel in person, by video, and telephonically to answer questions about the facts, review the complaint, respond to discovery requests, and participating in mediation. Livengood Decl. ¶ 14. Mr. Puryear has also spent additional time gathering documents and fielding questions from potential class members. *Id*. ¶ 14. Throughout the mediation process, he offered valuable input and provided approval at each step of the way—advocating not only for his own interests, but those of the whole class. *See* Puryear Decl. ¶¶ 14–15.

37

Other courts in the Fourth Circuit have granted similar service awards in recognition of this kind of work. In *Binotti*, the court granted a service award of $65,000 for a case that also settled before discovery was under way. *Binotti*, 2021 WL 5366877 at *5. Similarly, in *Helmick v. Columbia Gas Transmission*, No. 2:07-cv-743, 2010 WL 2671506 (S.D. W. Va. July 1, 2010), the court awarded the named plaintiff $50,000, where the settlement fund for the class was only $450,000, recognizing that the plaintiff had "cooperated with experts, participated in mediation, provided valuable background information, participated in discovery, and engaged in frequent travel to Kanawha County from her home in Roane County, West Virginia," *Id.* at *3. *See also, e.g.*, *In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*, No. 3:18-CV-00850, 2021 WL 5195089, at *4 (E.D. Va. July 27, 2021) ("District courts in this Circuit have approved service awards of up to $125,000 for plaintiff class representatives for providing information to class counsel, receiving and approving pleadings, assisting in discovery, and participating in settlement discussions.").

### B. Financial or Reputational Risk

Moreover, as the sole Named Plaintiff, Mr. Puryear took on significant reputational harm. Mr. Puryear left prison, as most people do, eager to put the past behind him. Nevertheless, in service of the lawsuit, he put his criminal record in the public eye, responding to press inquiries and speaking publicly about the over-detention.[7] As a result, the nature of his conviction is readily apparent online, in a way that is not true for the 52 other class members. Courts have acknowledged the benefit of media to alerting the class about the action and have recognized that it is appropriate to award named plaintiffs for time spent on media. *See Matheson v. T-Bone*

---

[7] *See, e.g.*, Tom Jackman & Laura Vozzella, *Lawsuit: Va. prison leaders kept inmates from early release*, WASH. POST (July 5, 2024), https://www.washingtonpost.com/dc-md-va/2024/07/05/virginia-lawsuit-denial-early-release-puryear/.

*Rest., LLC*, No. 09 CIV. 4214 DAB, 2011 WL 6268216, at *9 (S.D.N.Y. Dec. 13, 2011) ("Media coverage of a class action can benefit the class, and a named plaintiff's involvement in it further supports a service award.").

Mr. Puryear is also the only class member who had private aspects of his life subject to significant scrutiny through litigation. While Mr. Puryear was incarcerated, email was a primary way he communicated with his family and everyone in the outside world. Puryear Decl. ¶ 3. VDOC has access to all the emails Mr. Puryear sent and received while incarcerated—nearly 8,000 messages—and Defendants produced them during discovery. Both defense counsel and Plaintiff's counsel thus reviewed thousands of extremely personal and sensitive emails. Livengood Decl. ¶ 14. Mr. Puryear endured this serious privacy incursion to fulfill his role as the sole Named Plaintiff, and as a result, every other class member will benefit from the settlement while avoiding a similarly intrusive review of personal correspondence.

### C.  The Size of the Award

In addition to being in line with other awards in this Circuit, as described above, the amount of the award is also reasonable in relation to the overall settlement fund. A $40,000 service award would be 2.5% of the settlement fund, a ratio other courts have explicitly recognized as reasonable. *See, e.g.*, *Reynolds v. Fid. Invs. Institutional Operations Co., Inc.*, No. 1:18-CV-423, 2020 WL 92092, at *5 (M.D.N.C. Jan. 8, 2020) ("[E]ven assuming there were twenty FLSA opt-in plaintiffs, all of the service awards total 2.5% of the settlement fund.").

And the average class award is quite high—over $21,000—such that the ratio here between the service award and the average class payment is under 2:1. Courts have approved much higher ratios. *See Binotti*, 2021 WL 5366877, at *6 (approving a service award with a 20:1 ratio to average class recovery and citing *In re High-Tech Employee Antitrust Litig.*, No. 11-cv-

39

2509, 2015 WL 5158730, at *18 (N.D. Cal. Sept. 2, 2015), where the court approved service awards 14-21x greater than the average class award and service awards of $100,000 to $300,000); *Berry*, 807 F.3d at 613–15 (affirming approval of $5,000 service award where some class members received $300 and some received no financial compensation at all).

### D.  No Conflict Between Mr. Puryear and the Class

As the Court explained in *Binotti*, the Fourth Circuit identifies "red flags" for service awards that would suggest a conflict between the Named Plaintiff and class members. *See Binotti*, 2021 WL 5366877, at *6; *Berry*, 807 F.3d at 613–14. None are present here.

The Fourth Circuit notes that there may be a concern where the relief to the class members is "perfunctory," *Berry*, 807 F.3d at 613, which, with an average award of more than $20,000 per plaintiff, is clearly not so here. The Fourth Circuit also notes that a conflict may arise where "incentive agreements are entered into at the onset of litigation." *Id.* Again, that is not the case here; Defendants vigorously opposed the complaint through a motion to dismiss, and no discussion of the service award took place until the arm's-length mediation conducted by Judge Speight, in which Defendants agreed not to oppose a request for up to $40,000. Finally, the Fourth Circuit explains that there may be a concern where the service award is conditioned on class representative support for the settlement, but that is not the case here.

### CONCLUSION

For the reasons stated herein, Plaintiff respectfully asks that the Court approve the proposed settlement, certify the settlement class, and approve the requested attorneys' fees and service award.

Date: May 5, 2025

Respectfully Submitted,

/s/ *Michael Allen*
Michael Allen
Rebecca Livengood*
Ellora Thadaney Israni*
Emahunn Campbell*
RELMAN COLFAX PLLC
1225 19th St. NW Suite 600
Washington, D.C. 20036
Tel: 202-728-1888
Fax: 202-728-0848
mallen@relmanlaw.com
rlivengood@relmanlaw.com
eisrani@relmanlaw.com
ecampbell@relmanlaw.com

*Attorneys for Plaintiff*

*\*Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 5, 2025, a true and correct copy of the foregoing

Memorandum of Law in Support of Plaintiff's Unopposed Motion for Final Approval of Class

Action Settlement, Certification of Settlement Class, Approval of Attorney Fee Award, and

Approval of Service Award was served via CM-ECF on all attorneys of record.


Date: May 5, 2025                               <u>/s/ *Michael Allen*</u>
                                                Michael Allen

                                                *Attorney for Plaintiff*